RECEIVED

JAN 0 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Willie E. Boyd, pro-se,  )
       Plaintiff,  )
  )
  )
v.  )  Case No. 05CV1096(RMU)
  )
  )
BUREAU OF ALCOHOL, TOBACCO,  )
FIREARMS and EXPOLSIVES,  )
      Defendant.  )
  )
  )
_____  )

### PLAINTIFF'S SECOND SET OF APPENDIX'S

These appendix's correspond with Plaintiff's Opposition to Renewed Motion for Summary Judgment, these appendix's are from **Appendix A-C.**

### LISTING OF APPENDIX

**APPENDIXES**

**A.** January 26, 2006 disclosure letter by Peter J. Chisholm, Senior Disclosure Specialist; the best available copies of documents previously released; segregable pottions of ATF Order 3250.1A. The May 13, 1997 tape conversation was also released in this disclosure.

**B.** Defendant's Reply in Suppoty of Motion for Summary Judgment, filed with the court on February 13, 2006, with Chisholm II Declaration, and Vaughn index, covering ATF Disclosure File # 05-336, docu. nos. 13-66 and #06____ docu. nos. 8-10 and 15.

**C.** December 8, 2006 Third Declaration of Chisholm, without a Vaughn Index.

[Dated: _3_ , January, 2006].

Respectfully Submitted,

Willie E. Boyd, pro-se

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Willie E. Boyd, pro-se, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 05CV1096(RMU) |
| | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS and EXPOLSIVES, | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF'S SECOND SET OF APPENDIX'S

These appendix's correspond with Plaintiff's Opposition to Renewed

Motion for Summary Judgment, these appendix's are from **Appendix A-C.**

## LISTING OF APPENDIX

**APPENDIXES**

**A.** January 26, 2006 disclosure letter by Peter J. Chisholm, Senior Disclosure Specialist; the best available copies of documents previously released; segregable pottions of ATF Order 3250.1A. The May 13, 1997 tape conversation was also released in this disclosure.

**B.** Defendant's Reply in Suppoty of Motion for Summary Judgment, filed with the court on February 13, 2006, with Chisholm II Declaration, and Vaughn index, covering ATF Disclosure File # 05-336, docu. nos. 13-66 and #06____ docu. nos. 8-10 and 15.

**C.** December 8, 2006 Third Declaration of Chisholm, without a Vaughn Index.

[Dated: _3_ , January, 2006].

Respectfully Submitted,

Willie E. Boyd, pro-se

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Plaintiff's Second Set of Appendix's, **Appendix A-C,** was placed in the Greenville-FCI mailbox, post-gae prepaid, on January 3, 2006 to:


Ms. Jane M. Lyons
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.,  Room 10-415
Washington, D.C. 20530


By,

Willie E. Boyd, pro-se
# 18498-044
Greenville-FCI
P.O. Box 5000, 3-B
Greenville, IL. 62246



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

Washington, DC 20226

www.atf.gov

JAN **2 6** 2006

REFER TO:  PJC/ 06-452

Willie E. Boyd
Reg. No. 18498-044
FCI Greenville
Federal Correctional Institution
P.O. Box 5000
Greenville, IL  62246

Dear Mr. Boyd:

Pursuant to ongoing litigation, enclosed are copies of the segregable portions of ATF
Order 3250.1A, the best available copies of documents previously released, and a tape of
a recorded phone conversation.

Sincerely,

Peter J. Chisholm
Senior Disclosure Specialist

Enclosure

**Appendix-A**

| TRACKING NO. | 20 HOUR EXPIRATION 11/07/95 | DATE/TIME 18:00 | ADD'L A.R. # | PROCESSED | PAGE # 1 of 1 | ARREST NUMBER 95/6/0003334 |
|---|---|---|---|---|---|---|

| CHARGES APPROVED BY: Ver # 1 Sgt | | ST. LOUIS METROPOLITAN POLICE ARREST REGISTER | LID NUMBER | OCN NUMBER |
|---|---|---|---|---|

| LAST NAME JACKSON | FIRST NAME BILLY | MIDDLE NAME M | JR/SR | LBNAME |
|---|---|---|---|---|

| RACE BLACK | SEX MALE | AGE 44 | DATE OF BIRTH 08/19/51 | STATE MO | OPERATOR'S LICENSE NUMBER-STATE | MARITAL STATUS SIN | COMPLAINT NUMBER |
|---|---|---|---|---|---|---|---|

| HEIGHT 508 | WEIGHT 195 | BUILD MEDIUM | COMPLEXION MEDIUM | EYES BROWN | HAIR BLACK | SOCIAL SECURITY NUMBER 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 | DOMESTIC INCIDENT NO |
|---|---|---|---|---|---|---|---|

| HOME ADDRESS 1403 E DESOTE | CITY ST LOUIS | STATE MO | ZIP CODE 63107 | (A.C.)HOME PHONE ( )652-022 |
|---|---|---|---|---|

| OCCUPATION CLERK | UNEMPLOYED | EMPLOYER (PRESENT OR LAST) COLES MOTEL |
|---|---|---|

| BUSINESS ADDRESS 4531 NATURAL BRIDGE | CITY ST LOUIS | STATE MO | ZIP CODE 63115 | (A.C.)BUSINESS PHONE 385-5131 |
|---|---|---|---|---|

SCARS, MARKS, TATTOOS (DESCRIPTION AND LOCATION), ARTIFICAL BODY PARTS, AMPUTATIONS, DEFORMITIES

| EMERGENCY CONTACT-NAME JAQUELINE BOYD | ADDRESS | (A.C.)PHONE ( )652-0229 | CALL COMPLETED DSN | 22:30 |
|---|---|---|---|---|

| PRISONER LOCATION | RETURNED FROM AUTHORITY |
|---|---|

| TIME ARRESTED 22:00 | DATE ARRESTED 11/06/95 | ARRESTING OFFICER | DSN | ASSIGNMENT | ASSIST DSN | ASSIST DSN | ASSIST DS |
|---|---|---|---|---|---|---|---|

| LOCATION OF ARREST 4531 NATURAL BRIDGE | TIME BOOKED 01:26 | DATE BOOKED 11/07/95 | BOOKING OFFICER WEATHERSPOON |
|---|---|---|---|

| | CHARGES | DOC. NO. | OFF.DATE | COURT | DATE | TIME |
|---|---|---|---|---|---|---|
| 1 | POSS CONTROLED SUBSTANCE(F) CN 95-164930 | | 11/06/95 | | | |

| ISS/REF Refig | TIME 9:47 | DATE CHARGE REVISION 11-7-95 | F M C D | INFO RECEIVED FROM | INFO RECEIVED BY | INFO.DISP.CN 95-164931 |
|---|---|---|---|---|---|---|
| BOND-SURETY | AGENT | ADDRESS | | TYPE | AMOUNT 5,000 | DATE RET. 11-14-95 | COURT 25 |

| 2 | UNLAWFUL USE WEAP FEL (F) CN 95-164930 | | 11/06/95 | | | |
|---|---|---|---|---|---|---|
| ISS/REF Ref | TIME 9:47 | DATE CHARGE REVISION 11-7-95 | F M C D | INFO RECEIVED FROM | INFO RECEIVED BY | INFO.DISP.CN 95-164931 |
| BOND-SURETY Same as line 1 | AGENT | ADDRESS | | TYPE Inc | AMOUNT | DATE RET. | COURT |

| 3 | ISS/REF | TIME | DATE CHARGE REVISION | F M C D | INFO RECEIVED FROM | INFO RECEIVED BY | INFO.DISP.CN |
|---|---|---|---|---|---|---|---|
| | BOND-SURETY | AGENT | ADDRESS | | TYPE | AMOUNT | DATE RET. | COURT |

| 4 | ISS/REF | TIME | DATE CHARGE REVISION | F M C D | INFO RECEIVED FROM | INFO RECEIVED BY | INFO.DISP.CN |
|---|---|---|---|---|---|---|---|
| | BOND-SURETY | AGENT | ADDRESS | | TYPE | AMOUNT | DATE RET. | COURT |

| HOW RELEASED BOND (BND) | RELEASE LOC. AREA (PP) | TIME RELEASED 0751 | DATE RELEASED 11/7/95 | RELEASED BY | AUTHORITY FOR RELEASE |
|---|---|---|---|---|---|

| SIGNATURE OF OFFICER RECEIVING PRISONER AND PROPERTY (38) | DEPARTMENT/AGENCY |
|---|---|

| FORWARDED TO PRISONER PROCESSING DATE/TIME | VERIFIED BY DSN | REMARKS |
|---|---|---|

I CERTIFY THAT MY NAME AND OTHER PERSONAL INFORMATION ON THIS FORM IS CORRECT.
I UNDERSTAND THAT FALSE STATEMENTS ARE PUNISHABLE BY LAW (RSMo 575.060).

| PRISONER'S SIGNATURE Billy Jon | SEARCHING OFFICER'S SIGNATURE |
|---|---|

ENTERED BY:    01:26    11/07/95

PRISONER PROCESSING COPY



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
1222 Spruce Street, Room 6-205
St. Louis, Missouri 63103
March 17, 1998

CE:MO:SO:JMG

MEMORANDUM TO:    Financial Crimes Enforcement Network (FINCEN)

FROM:    Special Agent ▮▮▮▮▮▮▮
         St. Louis II Field Office

THRU:    Group Supervisor
         St. Louis II Field Office

SUBJECT:    Request for Additional Investigation
            FINCEN Internal Case Number ▮▮▮▮

RE:    Willie E. Boyd, ATF IN# 745519-97-0012

---

On June 30, 1997, a request for FINCEN assistance was submitted by Special Agent (SA) ▮▮▮▮▮▮▮▮ Bureau of Alcohol, Tobacco and Firearms (ATF) relative to the investigation of Willie E. Boyd, an armed career criminal and major narcotics trafficker. The case against Boyd is set for trial on April 13, 1997, in U.S. District Court in Eastern Missouri. In preparation for trial, Assistant United States Attorney (AUSA) Gary M. Gaertner has requested that FINCEN conduct financial and commercial database checks for the following individual, who is the fiancée of Boyd:

   TROUPE, Sharon, B/F, 010266, SSN: 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

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Due to the impending trial date, it is requested that this request be *expedited*.

Please forward the results of this inquiry to SA ▮▮▮▮▮▮ at the above address. If there are any questions concerning this request, contact ▮▮▮▮ at (314) 539-▮▮▮

Thank you for your prompt attention to this matter.

                    Sincerely,                    (55)

                    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                    St. Louis II F.O.

| TRACKING NO. | 20 HOUR EXPIRATION 11/07/95 | DATE/TIME 18:00 | ADD'L A.R. # | PROCESSED | PAGE # 1 of 1 | ARREST NUMBER 95/6/0003334 |
|---|---|---|---|---|---|---|

CHARGES APPROVED BY: Ver # 1 WILLIE EDWARD BOYD

**ST. LOUIS METROPOLITAN POLICE ARREST REGISTER**

LID NUMBER    OCN NUMBER

| LAST NAME JACKSON | FIRST NAME BILLY | 07-11-49 | MIDDLE NAME M | JR/SR | LBNAME |
|---|---|---|---|---|---|

| RACE BLACK | SEX MALE | AGE 44 | DATE OF BIRTH 08/19/51 | STATE MO | OPERATOR'S LICENSE NUMBER-STATE | MARITAL STATUS SIN | COMPLAINT NUMBER |
|---|---|---|---|---|---|---|---|

| HEIGHT 508 | WEIGHT 195 | BUILD MEDIUM | COMPLEXION MEDIUM | EYES BROWN | HAIR BLACK | SOCIAL SECURITY NUMBER 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 | DOMESTIC INCIDENT NO |
|---|---|---|---|---|---|---|---|

| HOME ADDRESS 1403 E DESOTE | CITY ST LOUIS | STATE MO | ZIP CODE 63107 | (A.C.) HOME PHONE ( ) 652-0229 |
|---|---|---|---|---|

| OCCUPATION CLERK | UNEMPLOYED | EMPLOYER (PRESENT OR LAST) COLES MOTEL |
|---|---|---|

| BUSINESS ADDRESS 4531 NATURAL BRIDGE | CITY ST LOUIS | STATE MO | ZIP CODE 63115 | (A.C.) BUSINESS PHONE 385-5131 |
|---|---|---|---|---|

SCARS, MARKS, TATTOOS (DESCRIPTION AND LOCATION), ARTIFICAL BODY PARTS, AMPUTATIONS, DEFORMITIES

| EMERGENCY CONTACT-NAME JAQUELINE BOYD | ADDRESS | (A.C.) PHONE ( ) 652-0229 | CALL COMPLETED DSN | 22:30 |
|---|---|---|---|---|

PRISONER LOCATION                          RETURNED FROM AUTHORITY

| TIME ARRESTED 22:00 | DATE ARRESTED 11/06/95 | ARRESTING OFFICER | DSN | ASSIGNMENT | ASSIST DSN | ASSIST DSN | ASSIST DSN |
|---|---|---|---|---|---|---|---|

| LOCATION OF ARREST NATURAL BRIDGE | TIME BOOKED 01:26 | DATE BOOKED 11/07/95 | BOOKING OFFICER WEATHERSPOON |
|---|---|---|---|

| | CHARGES | DOC. NO. | OFF.DATE | MO CHG | NCIC | RSMo |
|---|---|---|---|---|---|---|
| 1 | POSS CONTROLED SUBSTANCE (F) | CN 95-164930 | 11/06/95 | | | 195.202,PAR 2 |
| 2 | UNLAWFUL USE WEAP FEL (F) | CN 95-164930 | 11/06/95 | | | 571.030 |
| 3 | | | | | | |
| 4 | | | | | | |

| TIME STAMP: RECEIVED | HT (inches) 68 | WEIGHT 213 | HAIR BLK | EYES BRO | TIME STAMP: PROCESSED |
|---|---|---|---|---|---|

PHOTOGRAPH (Yes) No    4 x 5    8 x 10    GROUP PHOTO WITH ID NO.

ST LOUIS POLICE Missouri SECT No Record Record

PHOTO BY

PROCESSING OFFICER

PROCESSING CLERK

NEW SCARS, MARKS, TATTOOS

PO10 05 16 16 / PM 03 03 10 13

PROCESSING NOTES
ID RECORD
YES.    NO

SIGNATURE OF PERSON FINGERPRINTED *Billy*

57

RIGHT FOUR FINGERPRINTS TAKEN SIMULTANEOUSLY

ID NO.

_ P & P _ LHH (DASH)

_ SS _ SHH _ NP _ NLC    _ NEW LB

CLASS 10 0 5U 90 13
M 17U III 13

REF.                    FBI #

OCN        SID #        5/D

Entered by:

**MEMORANDUM
OF CALL**                                    Previous editions usable

TO:

☐ YOU WERE CALLED BY—        ☐ YOU WERE VISITED BY—

OF (Organization)

☐ PLEASE PHONE  ▶  *(Enter area code,
if necessary)*                    ☐ DSN

☐ WILL CALL AGAIN          ☐ IS WAITING TO SEE YOU

☐ RETURNED YOUR CALL       ☐ WISHES AN APPOINTMENT

MESSAGE

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

NSN 7540-00-634-4018
50363-112

OPTIONAL FORM 363 (Rev. 7—94)
General Services Administration
*U.S. Government Printing Office: 1995 — 394-965

My name is ███████████, I'm a senior officer here at the Federal
Correctional Institution in Greenville, Illinois. Today's date
is August 21, 1997. The time is now 4 p.m. I'm making a copy
from the master logger of the phone call made by Inmate Willie
Boyd, register number 18498-044, on May 13, 1997 at 6:47 p.m.

(phone being dialed)

(recording) - in order to process your collect call, please state
your name at the tone - this is Loc-Tel - please stand by -
please stand by - please go ahead, you are now connected.

Willie Boyd:    Hello

Sharon Troupe:  Hey

Boyd:           What's up baby?

Troupe:         How you doing?

Boyd:           Oh, I'm alright

Troupe:         That's good.  (sigh)  So what you think?

Boyd:           You ever talk to ██████?

Troupe:         No, oh, he's supposed to call um, uh, what's his
                name back. I suppose he wants me to come tomorrow
                morning at 8:30.

Boyd:           Who?

Troupe:         Uh ██████, uh ████████

Boyd:           Uh-huh

Troupe:         But I, I have to go to the meeting tomorrow, but,
                I told him could I come tonight. See what I'm
                saying?

Boyd:           I'm talking about the lawyer.

Troupe:         That's what I'm talking about - I was wondering if
                I could come tonight, you know, and talk to him
                but he had left and uh, so he's suppose to call
                ██████ when he gets home, so to find out, you know,
                what I can do, I mean you know, well, what did
                what's his name tell you?

Boyd:           He was saying that he thought it was alright that
                you went.

Troupe:         So he said, he said he talked to the people,
                right?

| | |
|---|---|
| Boyd: | Well he talked to the lawyer. |
| Troupe: | So what he say? |
| Boyd: | He said that he uh, he wasn't going to keep you long about 30 minutes |
| Troupe: | Uh huh |
| Boyd: | and that he just wanted to talk to you about the pistol so they wouldn't try to charge with anything, that's what ▓▓▓▓ said, he said he knew him, |
| Troupe: | Oh did he? |
| Boyd: | Yeah |
| Troupe: | Ok, but... |

| | |
|---|---|
| Boyd: | He said he grew up with his father |
| Troupe: | Oh, ok. (inaudible) |
| Boyd: | Where Muhammed? |
| Troupe: | Oh, he went to the mailbox, Want me to get him right quick? |
| Boyd: | No |
| Troupe: | Ok |
| Boyd: | I'll be on the phone.  Ok, um, well just tell them the truth, you know, cause I didn't have a key to the apartment, that uh, we had fell out what back in October? |
| Troupe: | Uh huh, |
| Boyd: | and uh, that you'd all come back periodically to call, and the day that I showed up, Mohammed let me in the house, I got there about 6:00 and that was about the time you was getting off of work, right? |
| Troupe: | Uh huh, yeah, |
| Boyd: | Would, wouldn't you say ▓▓▓▓▓▓▓▓ brought the bag over there about the end of November? |
| Troupe: | Um, yeah, a little, yeah in November. |

Boyd:      Yeah, about the end of November, the first of December, and that's when he showed you the pistol, and

Troupe:    Uh huh, and I thought he, he took it back out with him, but I didn't know he put it in the closet.

Boyd:      Uh huh.

Troupe:    Yep, but, um,

Boyd:      Didn't you say it had a infrared thing on it?

Troupe:    Yeah, but, you know, but he, when he called what's his name back, um, I was gonna um, just go by there so he could talk to me too, um ▮▮▮▮,

Boyd:      Uh huh

Troupe:    So you to see, you know what he say, you know, a second opinion.

Boyd:      Right, right

Troupe:    So you wanna do that?

Boyd:      Yeah, uh huh,

Troupe:    So, um, I told, I told him I had to wait for you to call first before, um, I left to go anywhere.

Boyd:      Uh huh.

Troupe:    Yeah, but other than that

Boyd:      You remember you was telling me about that time he came in there and he was, he loaded the pistol up and left with it and then brought it back?

Troupe:    Yeah

Boyd:      Yeah, but you never did go in the bag, but you knew he had one in there at one time.

Troupe:    Right.

Boyd:      You know, you know what to say.  Just tell the truth.

Troupe:    Yep, that's all I can do is just tell the truth.

Boyd:      Yeah.

Troupe:    The truth will set you free.  Um, You gotta a

|          | card, I know you got a card today? |
|----------|------------------------------------|
| Boyd:    | Yeah I got one today. |
| Troupe:  | You didn't get your, um, your book? |
| Boyd:    | No, I ain't got no book. |
| Troupe:  | I think they holding em or something, looking through them real good. |
| Boyd:    | (laughing) - I don't know, it ain't nothing but the Invisible Man and what's the other one? |
| Troupe:  | Uh, Islamic Nation, or something, the yellow book, I'm gonna go to the mall, I saw some books, I saw some books in a magazine and they said it was available in your local store, it was in the, um, in the, um, Essence magazine, it was some book out by, one of them was a book by, I know the guy, what's his name, ████████ I don't know if you already had it, read it or anything, |
| Boyd:    | Huh? |
| Troupe:  | A book by ████████ or something? |
| Boyd:    | No that's the Invisible Man, |
| Troupe:  | No, somebody else named ████, it was somebody named, I mean, last name ████ or something? |
| Boyd:    | Um... |
| Troupe:  | It was a black author, they had um, some of the top authors or something like that. |
| Boyd:    | Uh huh. |
| Troupe:  | Yeah. |
| Boyd:    | Well, he only published one book, his other book was incomplete. |
| Troupe:  | Well, it was another name, another man then. |
| Boyd:    | Uh huh.  You said he went to the mailbox? |
| Troupe:  | Yeah, he upstairs now.  I'm downstairs in the basement putting these damn shoes back on |
| Boyd:    | So he got a subpoena too then? |
| Troupe:  | Yeah, |

Boyd:        Oh, ok.

Troupe:      They just put MM for juvenile, whatever.

Boyd:        Uh huh.  They served him with it?

Troupe:      Yeah.

Boyd:        Well take him down there with you.

Troupe:      Right, yeah, but he was saying if he, if he, he
             say he know he might not be able to make it but
             his partner, he say he can go down there with me,
             his partner um, um, ███████ partner,

Boyd:        Uh huh

Troupe:      He said he, he go down with me, and um, even
             though I'm gonna hurt his side, you know, see what
             ~~he say, yep, if he's talkin the same thing, you~~
             know, a different opinion.

Boyd:        Yeah, well, it would be good for him to go down
             there, it can't hurt nothin.

Troupe:      No.

Boyd:        You know and then, you know, that would be like
             protecting your rights too.

Troupe:      Right, what you say babe?

Boyd:        I said that would be like protecting your, tell
             Muhammed to pick the phone up.

Troupe:      Ok.  (background - Troupe calling Muhammed)

Troupe to Muhammed:  Pick the phone up upstairs.

Muhammed Mateen:    Hello.

Boyd:        Hey,

Mateen:      Uh huh.

Boyd:        Now you know you're going down there to testify
             tomorrow, right?

Mateen:      Right.

Boyd:        Ok.  Now they gonna ask you some questions, just
             tell the truth, that you never saw me with a gun,

| | |
|---|---|
| Mateen: | Right. |
| Boyd: | Never. Ok, uh, uh, that you, that you seen ████ bring the bag in and out that house before. |
| Mateen: | Uh huh |
| Boyd: | Right? |
| Mateen: | Uh huh. |
| Boyd: | And, uh, you saw him one day with the gun on the bed, you know what I mean. |
| Mateen: | Uh huh. |
| Boyd: | and, and, you just went on back downstairs, right? |
| Mateen: | Uh huh. |
| Boyd: | ~~You know I didn't stay there, and I didn't have no~~ key there. |
| Mateen: | Uh huh. |
| Boyd: | And the day that I was there, I got there about 6:00, and we was watching TV in the bedroom, and I went to the bathroom, you was eating, you was eating dinner on the bed, in your momma's room, right? |
| Mateen: | Uh huh. |
| Boyd: | You heard a knock on the door, you went downstairs and that's when they came in and I was coming out the bathroom, but you was downstairs. |
| Mateen: | Uh huh. Alright, I got it. |
| Boyd: | Uh, ████ had a key to the apartment, |
| Mateen: | Uh huh. |
| Boyd: | He use to, he use to come and go and you never did question what he was doing. |
| Troupe: | Hello? |
| Boyd: | Uh huh, I'm just thinking, and uh, you know that me and your momma had fell out so you know that she had took her key. |
| Mateen: | Uh huh. |

Boyd:        You know what I'm saying?

Mateen:      Yeah

Boyd:        That's about it, you probably know, you know, just
             tell the truth.

Mateen:      Uh huh.

Boyd:        Can you think of anything else that he did baby?

Troupe:      Huh?

Boyd:        Can you think anything else that he did?

Troupe:      No, I mean, the b-b-b-black bag, I didn't know
             that was in there,

Boyd:        Huh?

Troupe:      ~~The black bag, that I didn't know that he had,~~
             still left in the house.  I remember him having a
             black bag, having the black, black bag, the last
             time he took it with him, but it was still in the
             closet,

Boyd:        Uh huh

Troupe:      When, um, the marshals came in.

Boyd:        Uh huh.  But I mean, it, it had been there, right?

Troupe:      Right, I assumed he had took it out, but, me not
             really going in that closet that much, you know,
             so, I never did pay attention to the bag still
             being in there.

Boyd:        I thought you said it was there all the time?  And
             he use to come and go in it?

Troupe:      Right, but, I knew the bag was in there, but I
             never knew if, you know, if he ever took the bag
             out to put some more stuff in it, and, bring it
             back, or was he coming back and forth.

Boyd:        You didn't know if he had left the gun in there or
             not?

Troupe:      Huh?

Boyd:        You seen the gun before,

Troupe:      Right,

Boyd:       But you didn't know if he had took it out.

Troupe:     Right.

Boyd:       And you knew it was his gun?

Troupe:     Right, cause I told him I didn't want that gun in
            this house.

Boyd:       Cause when you got into, when we got into it he
            was saying that you can have it for protection
            against me, right?

Troupe:     Right.

Boyd:       Um huh.

Troupe:     Yep.

Boyd:       Well my son you be on stage tomorrow.

Mateen:     Not something to be looking forward to.

Boyd:       No, no, but you can handle it all.

Mateen:     Uh huh, I'm on point

Boyd:       Keep your head up. Ok, that's all I wanted to
            say, I love you.

Mateen:     I love you too. (hangs up telephone)

Troupe:     Hello.

Boyd:       Uh huh.

Troupe:     Hey.

Boyd:       Uh, yeah, and tell him to don't volunteer nothing,
            let him ask stuff, you know.

Troupe:     Yeah, cause they're gonna all interview us
            separate anyway, right?

Boyd:       Right.

Troupe:     Yeah. Yep, yep yep, (pause)  So how was your day
            today?

Boyd:       Oh, it was alright.

Troupe:     I saw ███████ today.

Boyd:       Where was ██████ at?

Troupe:    She came up to get her check, and I'm going to get
           her tomorrow and bring her up this Thursday with
           me.

Boyd:      Ok,

Troupe:    Yeah, oh, sweetie, ... as soon as she seen me she
           started to giggle and laugh so much, I knew she
           knew Sharon, I knew she knew Sharon, and she
           laughed and uh sweetie it almost brought tears to
           my eyes.  You should have (inaudible) had little
           ponytails on it, she had like four little pigtails
           on her, her little hair sticking out, she looked
           so cute, and she was just a giggling and laughing
           while I was holding her and stuff, and she would
           say you come to me and she was like no, like move
           her hand like no, you know, and oh sweetie you
           should have saw her, she was so cute, yeah, really
           cute, yeah, so ▮▮▮ go and get her in the morning,
           and then I'm goin to get her tomorrow evening
           cause I go to the hairdresser and stuff, so I'm
           goin to get her tomorrow evening and uh, bring her
           Thursday with me.

Boyd:      Uh huh.

Troupe:    Muhammed, you go to work Thursday?  You go
           Thursday?  OK, yep.

Boyd:      Yeah, yeah, yeah, Muhammed said that ▮▮▮ had
           been over there earlier that day too.

Troupe:    Oh really?

Boyd:      Yeah.

Troupe:    Oh ok.

Boyd:      You know, so don't let him forget to mention that.
           I guess around noon sometime.

Troupe:    Oh ok.

Boyd:      Cause he just walked in and walked back out.  Ok?

Troupe:    Yep.  Yep.

Boyd:      Yep, yep, yep, yep.

Troupe:    Yep, yep.  I was telling ▮▮▮ I had to go right,
           Well they tell you you gotta go, yep.

Boyd:      Did you tell him what for?

Troupe:     Yay, and nay.

Boyd:       What you mean?

Troupe:     It was the neighbors.  On behalf of the neighbors.

Boyd:       Oh, uh huh.  Well,

Troupe:     There's no name on the thing anyway.  It's just my name.

Boyd:       Oh you showed it to him?

Troupe:     No, no, just in case, well I'm goin to show ███ tomorrow, you know, he take my word for it, yeah

Boyd:       Oh boy,

Troupe:     You know the guy I'm talking about, I told you what he said, (beeping), I said well, well I said why we gotta get inconvenience, hell, (inaudible) that's how they do it, the system, the Federal system, but he said that um, the um, the state is different, the state you can postpone, due to whatever, talking about you get, I said I ain't worried about no $45, hell, that ain't the point, me being inconvenienced, I gotta a meeting I gotta go to, where well the meeting at, that's not important where the meeting at, the point is that I'm being inconvenienced, hell.

Boyd:       Well the phone's getting ready to cut off.

Troupe:     You'll call back.

Boyd:       Yeah.

Troupe:     Alright.


(End of tape)

*1435 · Desoto*

*6-2-97*

**SEARCH WARRANT**
**JUDGE'S COPY**

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Police Officer ████████████ DSN ████, being duly sworn depose
the following to wit:

I have been a Police Officer with the St.Louis Metropolitan Police
Department since ████████████ and I am currently assigned to the

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████ black Female who he/she knows as Mary
160-180 pounds, 5'3" - 5'5", medium complexion is allowing illegal
narcotics to be sold and stored from her residence at 1435 Desoto. The
informant stated that Mary has allowed an individual named Willie Boyd
to use her house to store his narcotics and monies obtained from
illegal drug trafficking. It is to be noted that Willie Boyd is in
custody for drug trafficking at the time of this writing. ██████████
██████████ associates of Willie Boyd are continuing his drug trade
while he is in custody.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



79

On 06-02-97, at 0800hrs. Officer ████████ DSN ████ and I set up a surveillance point with an unobstructed view of the front of 1435 Desote. During the surveillance we observed several unknown black males walk up to the front door of 1435 Desoto and knock. The front door would be answered by a black male matching the description and pedigree of the two black subjects ███████████████████████. A black male would then make a hand to hand transactions with each transaction lasting approximatley one to three minutes.

It should be noted that Federal Marshall's arrested Willie Boyd hiding in the residence of 1435 Desoto.

A utilities check of 1435 Desoto revealed the name of Mary Bearmon, B/F, DOB 03-12-23, SSN 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.

1435 Desoto is a single family brick structure with the address clearly marked. This dwelling is located within the city of St. Louis.

It is my firm belief that crack cocaine and heroin is being stored and distributed from this residence.

Subscribed and sworn to before me this ___ day of ____, 1997, at ___ a.m. / p.m.

P.O. ███████████████   DSN ████████

*Best Copy Available*

JUDGE

-2-

the Bureau of Prisons (BOP) for Freedom of Information Act (FOIA) violations. Boyd and his mother, Mary Dearmon are currently suing the St. Louis Metropolitan Police Department (SLMPD) in federal court alleging violation of his civil rights and property damage. This lawsuit stems from the execution of a state search warrant at 1403 E. DeSoto, St. Louis, Missouri. Assistant United States Attorney (AUSA) Gary M. Gaertner and SA ████████████████ Boyd's narcotics trafficking was continuing during his incarceration and that narcotics, firearms and currency were being kept at the residence at 1403 E. DeSoto. ████████ contacted Mobile Reserve Unit officers and introduced them to the cooperating individual. The officers, in turn, conducted an independent investigation that led to the issuance of a state search warrant. One (1) firearm was recovered from the aforementioned residence.



After consultation with Richard L. Poehling of the United States Attorney's Office and St. Louis City Counselor ████████████████ attempted to locate the cooperating individual by utilizing the following investigative techniques:

- Ran the subject through computer indices ██████████
- Checked the subject for current employment ████
- Ran the subject ████████████ for utility service ████
- Left a note ██████████████████████████ (no response).
- Contacted a FBI Agent and local police officer that dealt with the subject in the past to generate additional leads.



SA ████

(83)

Violat history    (Killed witness in Case involving    Calif Conv.
                  197?'s ████ / Reop)                  Threatens
                                                        w/ explo
                                    FED
                              FOR PROB VIOL.

| 2/1/97 | BOYD ARRESTED BY USMS w/GUN & DRUGS |
| 2/13/97 | US ATTORNEYS OFFICE (POEHLING) REQUEST |
|  | FOR ATF ASSISTANCE. (PROPERTY TAKEN IN CUST) |

Investigation initiated

5/13/97 @ 6⁴ᵖ  Conversation btwn Boyd, Sharon Frouge,
              Muhammed Mateen. after serving of GJ Subp

5/14/97  GJ Appearance — Frouge/Mateen

████████████████████  ████████████

S/A ████ Locates ████ — during meeting
     w/ AUSA Gaertner — ██████████████

████████████████████████████████

████████

⑧⑥

UNIT DESIRED _____ 1 2R (CO) 11 _____ Date _____, 19 ___

(Please Print)

NAME 1) Billy Jackson    Age 44    Birthdate 05/19/51    Social Sec. # 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

NAME 2) _____ (Spouse's Name & Maiden) _____ ) Age ___    Birthdate ___/___/___    Social Sec. # _____

TELEPHONE 652-0229 _____ (Home) _____ 355-5131 (Business)

PRESENT ADDRESS 1403 C. DeSoto St Louis MO 63107    3 yrs.
(Street) (City) (State) (Zip) (Length of Residence)

 or    A) PRESENT LANDLORD Jacqueline Boyd 1403 E. DeSoto MO 63107  $275.00
(Name) (Apt Community) (Address) (Rent Paid)

    B) HOME MORTGAGE _____
(Mortgagor) (Address) (Term) (Mo. Payment)

PREVIOUS ADDRESS 4712    SHaw St Louis MO 63110    4 yr.
(Street) (City) (State) (Zip) (Length of Residence)

PREVIOUS LANDLORD ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇  $250.00
(Name) (Address) (Phone) (Rent Paid)

## OTHER PERSONS TO OCCUPY APARTMENT

| Name | Relationship | Birthdate |
|---|---|---|
| | | |
| | | |
| | | |

DO YOU OWN ANY PETS?  ☐ Yes  ☒ No    If Yes, Type _____    Lbs. _____

|  | (1) | (2) SPOUSE'S |
|---|---|---|
| PRESENT EMPLOYER | C & Cole's Motel | PRESENT EMPLOYER |
| ADDRESS | 4531 Natural Bridge | ADDRESS |
| DATES OF EMPLOYMENT | June 1955 | DATES OF EMPLOYMENT |
| POSITION | Maintenance | POSITION |
| NAME OF SUPERVISOR | ▇▇▇▇▇▇▇ | NAME OF SUPERVISOR |
| TELEPHONE | | TELEPHONE |
| GROSS MONTHLY INCOME | $1,360.00 | GROSS MONTHLY INCOME |
| DRIVERS LICENSE # | 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 | DRIVERS LICENSE # |
| AUTOMOBILES OWNED | QSL-051 (License #) 1310 (State) Mercedes (Make) 86 (Year) | |

| | | | |
|---|---|---|---|
| PREVIOUS EMPLOYER | Hendricks Auto Repair | PREVIOUS EMPLOYER | Hansen Ind. Svc |
| ADDRESS | 4766 Page    PHONE ▇▇▇ | ADDRESS | 4466 Elec    PHONE |

FINANCIAL REFERENCE

BANK    Mercantile Bank    ACCOUNT # _____ ☑ CHECKING  ☐ SAVINGS
_____    ACCOUNT # _____ ☐ CHECKING  ☐ SAVINGS

VISA OR MASTER CHARGE NUMBERS _____

| CREDIT | _____ (Name) _____ (City) | ACCOUNT # _____ |
|---|---|---|
| CREDIT | _____ (Name) _____ (City) | ACCOUNT # _____ |
| LOAN | _____ (Bank Co. Co) | MO. PAYMENT _____ (Amount) (Amount Paid Total) |
| LOAN | _____ (Bank Co. Co) | MO. PAYMENT _____ (Amount) (Amount Paid Total) |

HAVE YOU EVER BEEN EVICTED OR SUED FOR PAYMENT OF RENT? No    IF YES, INDICATE WHEN SUCH ACTION WAS TAKEN, WHERE (CITY AND STREET ADDRESS), BY WHOM, FOR WHAT REASON AND THE OUTCOME OF THE ACTION.

NAME AND ADDRESS OF NEAREST RELATIVE
NAME Mary DeArmon    ADDRESS 4490 W. Page    PHONE 535-7637
Albert Brown    18126 E. DeSoto    PHONE 355-3718

AR#:95/3334   OCA:████    *   ARR:2200 11/06/95 OFF:████████
BOOKED:████  11/07/95 BOOK-OFF:████████    AUTH ██████      SL-CTY-PD 6
RELEASED ON BOND - ████ 11/07/95 RBY:3923 (P)
ARRESTED 4531   NATURAL BRIDGE  ST LOUIS MO  GEO█████
** VERIFY STATUS OF CHARGES WITHOUT COURT DISPOSITIONS BEFORE **
** RELEASING INFORMATION FOR NON CRIMINAL JUSTICE PURPOSES **
CHG-01 SUSPECT POSS CONTROLED SUBSTANCE (F) STA:195.202,PAR 2 NC:3532 CD:324503
       OFF DATE:11/06/95
       CHG-REL WARRANT REFUSED-OTHER EVIDENCE PROBLEMS CT:CIR25 BND:$5000.00 11
       DISP:11/07/95  DOCUMENT:CN 95-164931
       PROFESSIONAL- SURETY:████████
CHG-02 SUSPECT UNLAWFUL USE WEAP FEL (F) STA:571.030 NC:████ CD:████
       OFF DATE:11/06/95
       CHG-REL WARRANT REFUSED-OTHER EVIDENCE PROBLEMS CT:CIR25 BND: INCL 11/14
       DISP:11/07/95  DOCUMENT:CN 95-164931
       PROFESSIONAL- SURETY:████████
EMRG-CT:JAQUELINE BOYD  ST LOUIS MO  TEL:652-0229(    )
EN:████████      CH:████████      RL:████████

                       *** END OF MESSAGE ***
████████  RESPONSE FROM CORRECTIONS TRACKING SYSTEM    02-04-98 14:48:59

**** CONFIDENTIAL INFORMATION RESTRICTED TO CRIMINAL JUSTICE AGENCIES ****
INPUT: JACKSON, BILLY  B/M  08/09/51

NAME: JACKSON, BILLY M (S)        REF: ████████
RACE: B   SEX: M   DOB: 08/19/51   AGE: 046   JUV:    POB: MO   LANG:
HGT: 5-07  WGT: 135  HAIR:    EYES:    SKIN:
SSN: 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
LID:████
INACT - CUSTODY - MEDIUM SECURITY INST
  CUSTODY NAME: JACKSON, BILLY M (S)
    START: 02/05/80  IN-ACTION: POLICE DEPARTMENT
    END : 02/07/80  OUT-ACTION: BONDED
    ***CHG: 32040990 (F) VIO MO LAW POS MAR
    ***CHG: 32040990 (F) VIO MO SUB LAW POS         (140)

              ********** END OF MESSAGE **********
Amt: PAGE █████████████████              ████████

02/04/98 14:50:58        MULES SYSTEM        ████████      PAGE    1
   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
   * THIS RESPONSE IS NOT TO BE CONSIDERED A POSITIVE *HIT* SINCE THE   *
   * INQUIRY DOES NOT PERMIT A UNIQUE IDENTIFIER AND IS TO BE USED      *
   * ONLY TO ASSIST IN MAKING A DIRECT ████████                        *
   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
SID NO.  LNM        FNM        MI JSR S R DOB    SSN/MNU        CAU

                                                                2
                                                                2
                                                                2
████████        ████████        M                               2
   JACKSON         BILLY        M    M B 081951 493625241

```
      16:37     TECS II - FINANCIAL DATA BASE INFORMATION          120497  ████████
 TID=████████
 CTR RCN:
 REASON FOR PARTIAL: MULTIPLE
 PART I - PERSON CONDUCTING THIS TRANSACTION:
 NAME: TROUPE, SHARON
 ADDR: 2803 MAURER              ST LOUIS              MO63121
 OCCUPATION: STORE MANAGER        IDN: 495766145 DOB: 01/02/66
   DRIVER'S LICENSE: 495766145          MS

 PART IV - DESCRIPTION OF TRANSACTION:
 TRANSACTION TYPE: FOR WIRE TRANSFER
 TOTAL AMOUNT IN:         $10,400
 AMOUNT IN HUNDREDS IN:        $2,000
 NEGOTIABLE INTRUMENTS OR WIRE TRANSFERS
   # WIRE TRANSFERS:    2
 TOTAL AMT NEGOTIABLE/WIRE TRANSFERS:        $10,400

 PART V - FINANCIAL INSTITUTION REPORTING:
 BUSINESS:  OTHER
 BANK: OLIVE STREET CE
 PRESS ████ TO VIEW NEXT PAGE
 ████=HELP)  ████=MAIN MENU)  ████=HIT LIST)  ████=PREV SCREEN)  ████=NEXT SCREEN)
 ████ACCESS)    ████=PRINT RECORD)
 Online to ████████                              £ £¤              ¤
      16:38     TECS II - FINANCIAL DATA BASE INFORMATION          120497  ████████
 TID=████
 CTR RCN:████████
 ADDR: 1809 OLIVE ST              ST LOUIS         ████████
 EIN:████████

 RCN:████████         TRANSACTION DATE: 05/17/93
```



05:43 (P)      09/27

08:57 (P)   17    09/26
714-653-6668
TROUPE S



9/6/9
4:31p                    • Albert Green                    ①

¹neighbor   friend from street
            told him at stop
Police at the house
Albert came to talk
to police on porch

(175)   Sat on porch

I don't know nothing
about — but his Gun —
check it for fingerprints
my prints aint on it
not mine I didn't say
will ▓▓▓

PAGE    1

| Rank(R) | Database | Mode |
|---|---|---|
| R G OF G | MO RPA | Page |

Information Current through 07-31-1996
Database Updated:          06-23-1997
Update Frequency:          MONTHLY
Source:                    St. Louis City Assessor's Office

Real Property Asset Locator information is compiled from several private
sources and the most recently available tax assessor's annual tax roll.

Name Type:                 OWNER
Name:                      DEARMON MARY & WILLIE BOYD

Mailing Address:           1435 E DE SOTO AVE
                           SAINT LOUIS MO 63107-1222
Land Use:                  COMPANY
Lot Depth:                 0.
Assessor's Parcel Nbr:     3307 00 0180 0
Assessed Value Land:       $2,200
Assessed Value Bldgs:      $7,700
Assessed Value:            $9,900
Tax Amount:                $870.40
                           TO ORDER REAL PROPERTY DOCUMENTS CALL 800-777-8567

END OF DOCUMENT

                           Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Form **4789**
(Rev. September 1991)
Department of the Treasury
Internal Revenue Service

# Currency Transaction Report

► File a separate report for each transaction.
► For Paperwork Reduction Act Notice, see page 3.

*(Complete all applicable parts—See instructions)*

► Please type or print.

SEE REVERSE
OMB No. 1545-0183
Expires: 9-30-94

1 Check appropriate boxes if:   a ☐ amends prior report.   b ☐ exemption limit exceeded.   c ☐ suspicious transaction.

**Part I**   Identity of individual who conducted this transaction with the financial institution

2 If more than one individual is involved, see instructions and check here · · · · · · · · · · · · · · · · ► ☐

3 Reason items 4–15 below are not fully completed (check all applicable boxes):   a ☐ Armored car service (name) ► ..........
b ☐ Mail deposit/shipment   c ☐ Night deposit or ATM transaction   d ☐ Multiple transactions (see instructions)

| 4 Last name | 5 First name | 6 Middle initial | 7 Social security number |
|---|---|---|---|
| Troupe | Shawn | | 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 |

| 8 Address (number, street, and apt. or suite no.) | 9 Occupation, profession, or business |
|---|---|
| 2803 Manner | Store Manger |

| 10 City | 11 State | 12 ZIP code | 13 Country (if not U.S.) | 14 Date of birth (see instructions) |
|---|---|---|---|---|
| St Louis | MO | 63121 | | 01:10:2166 |

15 Method used to verify identity:   a ☑ Describe identification ► MO DL
b Issued by ► Missouri   c Number ► 495 76 6145

**Part II**   Person (see General Instructions) on whose behalf this transaction was conducted

16 If this transaction was conducted on behalf of more than one person, see instructions and check here · · · · · · · · ► ☐

17 This person is an: ☐ individual or ☐ organization   18 If trust, escrow, brokerage, or other 3rd party account, see instructions and check here · ► ☐

| 19 Individual's last name or Organization's name | 20 First name | 21 Middle initial | 22 Social security number |
|---|---|---|---|
| | | | |

23 Alien identification:   a Describe identification ► ..........
b Issued by ►   c Number ►

Employer identification number

| 24 Address (number, street, and apt. or suite no.) | 25 Occupation, profession, or business |
|---|---|
| | |

| 26 City | 27 State | 28 ZIP code | 29 Country (if not U.S.) | 30 Date of birth (see instructions) |
|---|---|---|---|---|
| | : | : | | : : : |

**Part III**   Types of accounts and numbers affected by transaction (If more than one of the same type, use additional spaces provided below)

31 s ☐ Savings ►.............   t ☐ Securities ►.............   н ☐ CD/Money market ►.............
c ☐ Checking ►.............   L ☐ Loan ►.............   o ☐ Other (specify) ►.............

**Part IV**   Type of transaction. Check applicable boxes to describe transaction

32 ε ☐ Currency exchange (currency for currency)

33 CASH IN:
D ☐ Deposit
g ☐ Security purchased
F ☐ Check purchased
F ☐ CD/Money market purchased
H ☑ For wire transfer
J ☐ Receipt from abroad
K ☐ Other (specify) ►

34 CASH OUT:
R ☐ CD/Money market redeemed
c ☐ Check cashed
T ☐ Security redeemed
W ☐ Withdrawal
u ☐ From wire transfer
x ☐ Shipment abroad
Y ☐ Other (specify) ►

35 Total amount of currency transaction (in U.S. dollar equivalent) (always round up)

Cash in $ 10490 ........ .00
Cash out $ ................ .00

36 Amount in item 35 in U.S. $100 bills or higher

Cash in $ 2000 ......... .00
Cash out $ ................ .00   ☐ Unknown

37 Date of transaction (see instructions)

0511793

38 If other than U.S. currency is involved, please furnish the following information:   a Exchange made ☐ for or ☐ from U.S. currency
b Country ..........   c Amount of currency (in U.S. dollar equivalent) $ ................ .00
b Country ..........   c Amount of currency (in U.S. dollar equivalent) $ ................ .00

39 If a negotiable instrument or wire transfer was involved in this transaction, please furnish the following information and check this box (see instructions) · · ► ☐
a Number of negotiable instruments involved..........   c Total amount of all negotiable instruments and all wire transfers
b Number of wire transfers involved 2   (in U.S. dollar equivalent) ► $ 10490 .00 ►

**Part V**   Financial institution where transaction took place

40 a ☐ Bank (enter code number from instructions here) ► [ ]
b ☐ Savings and loan association   c ☐ Credit union   d ☐ Securities broker/dealer   e ☑ Other (specify) ► WESTERN UNION

| 41 Name of financial institution | 42 Address where the transaction occurred (see instructions) | 43 Employer identification number |
|---|---|---|
| Olive Street CE | 1809 Olive St | |

| 44 City | 45 State | 46 ZIP code | 47 MICR number | Social security number |
|---|---|---|---|---|
| St Louis | MO | 63103 | | |

48 If this is a multiple transaction, please indicate:   a Number of transactions ►   b Number of branches ►   c ZIP codes ►

**Sign Here** ►

| 49 Signature (preparer) | 50 Title | 51 Date |
|---|---|---|
| | OPERATIONS MANAGER | 05-17-93 |

| 52 Type or print preparer's name | 53 Approving official (signature) | 54 Date | 55 Telephone number |
|---|---|---|---|
| Nancy J Pless | Jerry E. _____ dale | 5-28-93 | |

Cat. No. 42004W

TROUPE

employment

05/05/97 PAGE: 1

SOC-SEC-NO  495766145

| | NAME AND ADDRESS | | WAGES | NO.DEP: QUARTER |
|---|---|---|---|---|
| | MARITAL STATUS: | | | |
| | P & P MANAGEMENT, INC. STE 201 | | $ 7701.21 | OCT-DEC 95 |
| 970 FITZGERALD JACKSON 11422 GRAVOIS RD | CRESTWOOD MO | 63126 | | |
| 2   S TRO ATTN MALONEY & JACKSON 11422 GRAVOIS RD | P & P RESTAURANTS, INC. STE 201 CRESTWOOD MO | 63126 | $ 8346.17 | JAN-MAR 96 |
| 3 ATTN MALONEY & JACKSON 11422 GRAVOIS RD | RESTAURANTS, INC. STE 201 CRESTWOOD MO | 63126 | $ 7701.20 | APR-JUN 96 |
| 4   S TRO ATTN MALONEY & JACKSON 11422 GRAVOIS RD | P & P RESTAURANTS, INC. STE 201 CRESTWOOD MO | 63126 | $ 9201.27 | JUL-SEP 96 |
| 5   S TRO ATTN MALONEY & JACKSON 11422 GRAVOIS RD | P & P RESTAURANTS, INC. STE 201 CRESTWOOD MO | 63126 | $ 8884.76 | OCT-DEC 96 |
| 6   S TRO ATTN MALONEY & JACKSON 11422 GRAVOIS RD | P & P RESTAURANTS, INC. STE 201 CRESTWOOD MO | 63126 | $ 8884.75 | JAN-MAR 97 |

LAST PF6-TOP PF7-BKWD PF8-FWD PF9-BOTTOM PA2-PRINT

TRW        JIM

AGE 1   DATE  5-05-97  TIME 15:24:26  PCR01  V601

SHARRON TROUPE                    SS: 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
2091 VICTORY WAY LN                   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*
SAINT LOUIS MO 63138-1318         YOB: 1966
RPTD: 1-97 TO 4-97

2803 MAURER AVE
SAINT LOUIS MO 63121-5229
RPTD: 10-92 TO 11-96

4212 SHAW BLVD # 1FL
SAINT LOUIS MO 63110-3527
RPTD: 11-95 TO 6-96
** MORE

11124 WHISPERING OAKS DR
SAINT LOUIS MO 63136-5827
RPTD: 1-92 TO 6-92

342

------------------ FACS+ SUMMARY ------------------
INPUT SSN ISSUED 1976-1978

END -- EXPERIAN SOCIAL SEARCH

```
*******************************************************************
****05/05/97  15:22:35 - LB     MOI ADMINISTRATIVE PRINT    JG    LATF05V2*****
****** CONFIDENTIAL INFORMATION RESTRICTED TO CRIMINAL JUSTICE AGENCIES ******
******   SEARCH:TROUPE, SHARON B/F 01061966  SOC:495766145           *****
*******************************************************************
                                                                    *
                                                                    *
*******************************************************************
****05/05/97  15:22:35          MOI ADMINISTRATIVE PRINT             *****
*****   CONFIDENTIAL INFORMATION RESTRICTED TO CRIMINAL JUSTICE AGENCIES *****
*******************************************************************
*****   CONFIDENTIAL INFORMATION RESTRICTED TO CRIMINAL JUSTICE AGENCIES  *****
OCAL ID RECORD - REF ▆▆▆▆▆     CID ▆▆▆▆▆▆     -ST LOUIS COUNTY PD
TROUPE, SHARON                    B/F  31  DOB:01/02/1966  HGT:5-03  WGT:115
UILD:       COMP:PAR    HAIR:BRO   EYES:BRO   PLACE-OF-BIRTH:MO    MAR-STA:S
ID: ▆▆▆      SID: ▆▆▆      FBI:           FPC:▆▆▆▆▆▆
AST-PHOTO:11/18/88   LAST-IMAGE:          PALM-PRINTS:NO      AFIS:
------- ADDITIONAL ID'S - ▆▆▆▆▆▆▆▆
OC-SEC-N-01: 495761645      02: 495766145
----- RESIDENCE AND EMPLOYER ADDRESSES, OCCUPATION AND PHONE NUMBERS ---------
ES-02: 2748 J GLENBOURNE, ST LOUIS, MO 63136                         11/18/88
----01: 11934 SAN REMO, ST LOUIS, MO                    741-4412     02/17/88
MP-03: EMPLOYED-AS: MANAGER, BY: MCDONALDS                           11/18/88
        9815 MANCHESTER, ST LOUIS, MO 63136
    02: EMPLOYED-AS: MGR, BY: MCDONALDS                              02/17/88
        9815 MANCHESTER, ST LOUSI, MO
    01: EMPLOYED-AS: HOUSEKEEPER                                     02/17/88

--- ARRESTS AND CONVICTIONS  -  SUBJECT: TROUPE, SHARON                   *
    SUMMARIZED BY CID: ▆▆▆▆ ON 05/05/1997                                 *

1/18/1988 ST LOUIS COUNTY PD          ID-NO: ▆▆▆▆      TNO: ▆▆▆▆
ARR-NAME: TROUPE, SHARON
 ARR-NUM: ▆▆▆    OCA: ▆▆▆      OCN: ▆▆▆      REL PENDING WAR APPL
  CHG-01: PASS BAD CHCK UNDER 150    (M)  PEND APL OF WAR

2/17/1988 ST LOUIS COUNTY PD          ID-NO: ▆▆▆▆      TNO: ▆▆▆▆
ARR-NAME: TROUPE, SHARON
 ARR-NUM: ▆▆▆    OCA: ▆▆▆      OCN: ▆▆▆      EXCEPTIONAL CLEARED
  CHG-01: FUG-AIPORT POLICE          (M)  ADMIN RELEASED

- - - - -   CRIMINAL HISTORY SUMMARY IS COMPLETE  - - - - - - - - -
*****  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆     *****
```



WNER: TROUPE SHARON                                    LAST UPDATE: 12/17/91
DDRESS: 11124 WHISPERING OAK ST LOUIS MO 63            COUNTY: ST LOUIS COUNTY
IRST ISSUED:          SECOND ISSUED:                   ORIG TRANS: TITLE TRANSFER

          INPUT:
5/05/97 15:28:54          DEPARTMENT OF REVENUE          VEHICLE REGISTRATION
                                                         PRIMARY RESPONSE

ICENSE:       LIY:              TAB:              TYPE:
IN: 1J4GS5878KP102657           TITLE: AM117821
YR: 89 VMA: JEP  VST: STA W     VTP: PASSENGER   SERIES:
GT/SEAT:              AXLES:     FUEL: GAS        CYL: 08  HP:  51
WNER: TROUPE SHARON                              LAST UPDATE: 11/06/93
DDRESS: 2803 MAURER NORMANDY MO 63121            COUNTY: ST LOUIS COUNTY
IRST ISSUED:          SECOND ISSUED:             ORIG TRANS: TITLE REG

          INPUT:
5/05/97 15:29:00          DEPARTMENT OF REVENUE          VEHICLE REGISTRATION
                                                         PRIMARY RESPONSE

ICENSE:       LIY:              TAB:              TYPE:
IN: 1G3HY69L9G1831108           TITLE: UH044499
YR: 86 VMA: OLDS  VST: SEDAN    VTP: PASSENGER   SERIES: FRB
GT/SEAT:              AXLES:     FUEL: GAS        CYL: 06  HP:  34
WNER: TROUPE SHARON                              LAST UPDATE: 09/14/96
DDRESS: 2803 MAURER AVE ST LOUIS MO 63121        COUNTY: ST LOUIS COUNTY
IRST ISSUED:          SECOND ISSUED:             ORIG TRANS: TITLE TRANSFER

          INPUT:
5/05/97 15:29:06          DEPARTMENT OF REVENUE          VEHICLE REGISTRATION
                                                         PRIMARY RESPONSE

ICENSE: USZ807 LIY: 95          TAB:              TYPE: PASSENGER
IN: 1G4CX6939F1459860           TITLE: UH696044
YR: 85 VMA: BUIC  VST: SEDAN    VTP: PASSENGER   SERIES: E30
GT/SEAT:              AXLES:     FUEL: GAS        CYL: 06  HP:  34
WNER: TROUPE SHARON                              LAST UPDATE: 04/08/95
DDRESS: 2803 MAURER AVE ST LOUIS MO 63121        COUNTY: ST LOUIS COUNTY
IRST ISSUED: 11/16/93 SECOND ISSUED:             ORIG TRANS: TITLE REG

          INPUT:
5/05/97 15:29:11          DEPARTMENT OF REVENUE   (344)   VEHICLE REGISTRATION
                                                         PRIMARY RESPONSE

ICENSE: C4K206 LIY: 97          TAB:              TYPE: PASSENGER
IN: 1FMDU34X3NUA61112           TITLE: UK371871
YR: 92 VMA: FORD  VST: FODOR    VTP: PASSENGER   SERIES: EPR
GT/SEAT:              AXLES:     FUEL: GAS        CYL: 06  HP:  26
WNER: TROUPE SHARRON                             LAST UPDATE: 11/01/96
DDRESS: 2803 MAURER ST LOUIS MO 63121            COUNTY: ST LOUIS COUNTY
IRST ISSUED: 03/27/95 SECOND ISSUED:             ORIG TRANS: TITLE REG

          INPUT:
5/05/97 15:29:17          DEPARTMENT OF REVENUE          VEHICLE REGISTRATION
                                                         PRIMARY RESPONSE

ICENSE: N2Z400 LIY: 97          TAB:              TYPE: PASSENGER
IN: 1YAPM8743L1422770           TITLE: AW781358
YR: 90 VMA: HOND  VST: FODOR    VTP: PASSENGER   SERIES: CB5
GT/SEAT:              AXLES:     FUEL: GAS        CYL: 04  HP:  22
WNER: TROUPE SHARRON                             LAST UPDATE: 08/24/96
DDRESS: 2803 MAURER ST LOUIS MO 63121            COUNTY: ST LOUIS COUNTY
IRST ISSUED:          SECOND ISSUED: 04/02/96    ORIG TRANS: TITLE REG

LICENSE: N2Z400 LIY: 97              TAB:                TYPE: PASSENGER
VIN: YV1FA8745L1422790               TITLE: AW781558
VYR: 90 VMA: VOLV VST: FODOR         VTP: PASSENGER      SERIES: 740
WGT/SEAT:                 AXLES:     FUEL: GAS           CYL: 04  HP:  22
OWNER: TROUPE SHARRON                                    LAST UPDATE: 08/24/96
ADDRESS: 2803 MAURER ST LOUIS MO 63121                  COUNTY: ST LOUIS COUNTY
FIRST ISSUED:           SECOND ISSUED: 04/02/96         ORIG TRANS: TITLE REG

              INPUT:

*****************************************************************
*                                                               *
*            GENERAL MESSAGE ROUTE SYSTEM                        *
*            PRINT DATE:05/05/97 TIME:15:31                      *
*                                                               *
*****************************************************************

MESSAGE NUMBER: 000751
TO            : BUREAU OF ATF (MOATFSLSO   )
FROM          : NCIC CTL TERM
DATED         : 05/05/97
SENDER ORI    : MO116NCIC

NCIC CCH/III SEQUENCE NUMBER   26363

NO IDENTIFIABLE RECORD IN THE INTERSTATE IDENTIFICATION INDEX (III)
FOR PUR/C.NAM/TROUPE,SHARON.SEX/F.RAC/B.DOB/010266.
END

*****************************************************************
                     E N D   O F   M E S S A G E

05/05/97 15:33:48        DEPARTMENT OF REVENUE   (345)        DRIVERS HISTORY
LB    TROUPE    SHARON                                         INDEX RESPONSE

S OPER  NUM   NAME                    S  DOB         ADDRESS
   495766145  TROUPE, SHARRON         F  01/02/1966  2803 MAURER, ST LOUIS
   495766145  TROUPE, SHARRON         F  01/02/1966  2803 MAURER, ST LOUIS



745519 97 0012

## REPORT OF INTERVIEW

With Albert Lee Greer, 1435 East DeSoto, St. Louis, Missouri, made on June 6, 1997, by Special Agent ▓▓▓▓▓▓▓, Bureau of Alcohol, Tobacco & Firearms (ATF).

On June 6, 1997, at 4:31 p.m., Special Agent (SA) ▓▓▓▓▓ and SA ▓▓ contacted Albert Lee Greer at his residence, 1435 East DeSoto, St. Louis, Missouri, relative to the ongoing federal investigation of Willie E. BOYD for the violation of federal firearms and narcotics laws.

SA ▓▓▓▓▓▓ and SA ▓▓ responded to the address on DeSoto to serve a federal Grand Jury subpoena for Greer relative to the investigation. SA ▓▓▓▓ had been advised by the Deputy U.S. Marshal (DUSM) ▓▓▓▓ that he had just spoken with Greer and that Greer indicated that he was going to leave town for Kansas City. DUSM ▓▓ stated that Greer advised him that Sharon Troupe (Willie Boyd's fiancee) had contacted Greer relative to the recovery of a firearm from the residence on DeSoto by St. Louis Metropolitan Police Department Mobile Reserve Officers.

Subsequent to the recovery of the firearms by the officers, Greer made an allegation to the Internal Affairs Division (IAD) of the St. Louis Metropolitan Police Department concerning the loss of $3,500 in U.S. currency during the search warrant execution by the Mobile Reserve Officers.

Upon arrival at 1435 East DeSoto, SA ▓▓▓ handed Greer his copy of the federal Grand Jury subpoena requiring his testimony on June 11, 1997, at 11:00 a.m. at the United States Court and Custom House, 1114 Market Street, St. Louis, Missouri. SA ▓▓▓▓ advised Greer that he was under federal subpoena and his appearance would be required on that date and time. SA ▓▓▓ advised Greer that any questions regarding the subpoena could be directed to Assistant United States Attorney (AUSA) Gary M. Gaertner, Jr. who is handling the prosecution of the BOYD case. Greer indicated that he understood the subpoena and would be at the courthouse on that date.

SA ▓▓▓ advised Greer that the subpoena was in reference to the recovery of the firearm at 1435 East DeSoto. Greer stated that a neighbor had contacted him at the shop (3780 W. Florissant) and told him that the police were at his house. Greer stated that he came to the house and talked to the police on the front porch. Greer stated that he told the police that if there is something in the house, I don't know nothing about it. Greer stated that the firearm recovered by the police was not his gun. Greer stated that he told the police to check it for fingerprints, my prints aren't on it. Greer stated that he does not recall telling the police that the gun belonged to Willie (BOYD).



346          1

745519 97 0012                    -2-

Greer stated that he had maybe $1,200 to $1,500 in cash in the
house, but was not sure. Greer stated that the house was owned by
Mary DeArmond. Greer stated that he was trying to find out if his
cousin, Stanley Boyd, took the money. Greer stated that, "I don't
believe the police took the money." Greer further stated that the
cousin (Stanley Boyd) "might have taken the money to smoke some
crack." Greer stated that Stanley is a crack cocaine user and that
he had been up and down the street to see if his cousin had been
buying any crack cocaine.

Greer stated that he and Sharon Troupe went to the Police
Department IAD together. Greer stated that Sharon Troupe picked
him up from work to take him to IAD. Greer stated that Troupe told
him to "ride with me" and she asked about what was missing from the
house. Greer stated that he told her that baseball cards were
missing from the house. At that point of the interview, Greer
stated, "I am scared to death." Greer stated that Willie (BOYD)
didn't tell him to claim the money was missing. Greer stated that
Sharon had told him to ride with her and that she estimated that
$3,500 was missing and told him that the police probably took it
since he couldn't find it. Greer again stated regarding the
missing money, "I don't think the police had anything to do with
it, since I dug into it." Greer stated that he had last saw the
money a week or so prior to the search warrant execution.

Greer stated that this is the second incident regarding missing
money. Greer stated, "I bet Stanley took it." Greer stated that
on a prior occasion, another brother had taken money from his
wallet. Greer stated that he found the baseball cards and StarWars
cards that he thought were missing from the residence.

The foregoing report of interview was reduced to writing following
the interview by the undersigned agent.



SA _____ , ATF





Rank(R)                 Database                Mode
R 1 OF 6                                        Page

Information Current through 07-31-1996
Database Updated:           06-23-1997
Update Frequency:           MONTHLY
Source:                     St. Louis City Assessor's Office

Real Property Asset Locator information is compiled from several private
sources and the most recently available tax assessor's annual tax roll.

Name Type:                  OWNER
Name:                       BOYD KENNETH & SHARRON TROUPE

Mailing Address:            3780 E DESOTO
                            SAINT LOUIS MO 63107
Land Use:                   COMPANY
Lot Depth:                  0.
Assessor's Parcel Nbr:      3308 00 0010 0
Assessed Value Land:        $2,100
Assessed Value Bldgs:       $4,700
Assessed Value:             $6,800
Tax Amount:                 $597.85
                            TO ORDER REAL PROPERTY DOCUMENTS CALL 800-777-8567

END OF DOCUMENT

Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

DATE OF LAST KNOWN ARREST: _1991_   PLACE _St. Louis_

NATURE OF ARREST: _Drugs_

\* VIOLENT HISTORY (Type): _Yes - Robbery w/DDW, Murder 1st_
see below  _Bomb material detonation in residence at one arrest_

DATE OF LAST FACE-TO-FACE CONTACT WITH PROBATION OFFICER: _11-1-95_

DOES SUBJECT KNOW WARRANT HAS BEEN ISSUED?    Yes ☒  No ☐  _Probably_

NEXT KNOWN COURT APPEARANCE:  Date _____  Location _____  Type _____

KNOWN CO-DEFENDANTS AND ASSOCIATES AND AREAS SUBJECT MAY FREQUENT (names, aliases,

addresses) _Wife, Sharon Troupe    Son Muhammed Mateen_
_3212 Shaw, 63110_

_No Co-Δ's_

KNOWN FAMILY AND RELATIVES (name, relation, address, phone no.) _____

_____

_____

OCCUPATION: _maintenance_   DATE OF LAST EMPLOYMENT: _present_

LAST EMPLOYER & ADDRESS: _Wm Cole Realty & Motel_  Bill or Jerry _4531 Nat. Bridge 63115_
_385-5731_

AUTOMOBILE, DESCRIBE: _none → 4517 Natural Bridge_

AUTO LICENSE NO., IF KNOWN: _none_    STATE: _____

OTHER RELATIVE INFORMATION: _____

_→ Narcotics detectives familiar with this enterprise as_
_being source of illicit narcotics._  ⊙387

NAME AND TELEPHONE NO. OF PROBATION OFFICER: ████████

NAME OF CHIEF PROBATION OFFICER OR SUPERVISOR: ████████

\* _Narcotics detectives consider Δ very dangerous. Narcotics_
_detectives or D. Baion very familiar w/Δ._

# ATF ● 3250.1A -- (10/26/2001) -- INFORMANT USE AND UNDERCOVER OPERATIONS

ATF O 3250.1A

10/26/2001

Change 1: 1/4/2002

Change 2: 4/2/2003

Subject: INFORMANT USE AND UNDERCOVER OPERATIONS

## FOREWORD

To: All Field Operations Personnel

1.    PURPOSE.  This order contains policy and instructions relating to informant usage, undercover operations, the Undercover Review Committee, and rewards and purchase of information.

2.    CANCELLATION.  This order cancels the following directives:

   a.    ATF O 3250.1, Informant Use and Undercover Operations, dated February 20, 1997.

   b.    ATF B 3250.2, Undercover Psychological Services Program, dated May 13, 2000.

   c.    ATF B 3250.3, ATF F 3250.1, Notification of Category 3/4 Undercover Investigation, dated December 8, 2000.

3.    QUESTIONS.  Any questions regarding the provisions of this order may be directed to the Chief, Special Operations Division.

Assistant Director

(Field Operations)

## TABLE OF CONTENTS

①

Page

CHAPTER A.  INFORMANT DEVELOPMENT, USE, AND CONTROL

1.    Policy on the Use of Informants
      1

2.    Informant Defined
      1

3.    Informant Suitability Determination
      1

4.    Informant Identification and Control File
      4

5.    Verification/Removal of Approved Informants
      7

6.    General Policy Guidelines
      9

7.    Use of Relocated Witnesses as Informants
      13

8.    Use of Foreign Nationals as Informants
      16

9.    Use of Military Personnel as Informants
      16

10.   Use of Federal or State Probationers, Federal Mandatory
      Releasees, Federal Parolees, and Federal or State
      Supervised Releasees as Informants
      17

11.   Use of State or Local Prisoners
      19

12.   Use of Persons on State Parole
      20

13.   Use of Federal Inmates in Investigations

20

14.  Undesirable/Unreliable Informant File
     23

15.  The Informant and the Disclosure Issue
     23

16.  Informant/Witness Protection and Relocation (ATF)
     25

17.  Reserved
     26

18.  Witness Security Program Procedures (U.S. Department of Justice)
     26 - 30

19.  Training
     37

20.  Reserved

NOT w/in SCOPE

3

CHAPTER A. INFORMANT DEVELOPMENT, USE, AND CONTROL

1.  POLICY ON THE USE OF INFORMANTS. It is ATF policy to use informants to assist in investigating criminal activity. Since using informants is a sensitive matter and will require the association of ATF special agents with persons whose motivations may be suspect or ultimately challenged by courts, this investigative technique shall be carefully controlled and closely monitored. Proper use of informants requires that individual rights not be infringed upon and that ATF conduct itself within the parameters of ethical and legal law enforcement behavior.

2.  INFORMANT DEFINED.

    a.  Confidential informants are defined as persons who assist enforcement efforts, providing information and/or lawful services related to criminal or other unlawful activity to ATF that otherwise might not be available, in return for money or some other specific consideration. Informants shall work under the direction and control of ATF special agents. The information or services provided must have specific investigative or general intelligence value in enforcing laws and regulations within ATF responsibility.

    b.  In addition to providing information, informants may be expected to participate in investigations or testify in open court, if required. They may also expect that their identities will not be disclosed, except with their approval. The United States will strive to protect informants' identities but cannot guarantee that they will not be divulged.

    c.  Special agents in charge (SACs) shall approve all informants before ATF uses them; however, this does not preclude a special agent from receiving information from a person on a one-time-only basis. Persons providing information on a one-time-only basis need not be documented; however, as always, the information should be verified.

3.  INFORMANT SUITABILITY DETERMINATION.

    a.  Before committing substantial resources or taking significant enforcement action based upon information provided by an informant of unknown reliability, special agents shall make all reasonable efforts to ensure that information provided by an informant is reliable and that the informant will not jeopardize an enforcement mission. Additionally, before using any

(4)

informant, the SAC shall make a suitability determination. Thereafter, the SAC shall document in the division's files that the suitability determination has been made. Information to be obtained and assessed must include the following:

(1)     The informant's true name and all known aliases.

(2)     Residence/business addresses and telephone numbers.

(3)     Personal description, including date and place of birth.

(4)     Current photograph of the informant and fingerprints (Federal Bureau of Investigation (FBI) Form FD-249, Arrest and Fingerprint Card).

(5)     Employment history. If unemployed, current source of income.

(6)     Social Security number.

(7)     Past activities (criminal or criminally associated).

(8)     Whether the informant is a substance abuser or has a history of substance abuse.

(9)     Whether the informant is related to an employee of any law enforcement agency.

(10)    FBI number and State and local criminal identifica-tion numbers.

(11)    Criminal reputation and known associates.

(12)    Whether the informant is in the military or is a public official, law enforcement officer, a representative of the news media, or a party to privileged communications (e.g., a member of the clergy, a physician, a lawyer, etc.).

(13)    Citizenship/alien status.

(14)    Parole/probation status.

(15)    Whether a record check of the informant identifica-tion file (paragraph 4) verifies the informant's past performance as a confidential informant.

(16)    Brief resume' of information furnished in the past, including:



      (a)    The name, title, and agency of the law enforcement official contacted regarding the informant's reliability.

      (b)    The reliability of the information provided.

      (c)    The date and value of the information furnished.

      (d)    Whether the informant will testify in open court.

      (e)    Identity of other agencies to which the informant is currently supplying information.

      (f)    If the informant has served as a confidential informant for another law enforcement agency, whether the agency terminated that relationship for cause and why.

(17)    Reason for becoming an informant, if known.

(18)    Whether the informant has shown any indication of emotional instability or unreliability or of furnishing false information.

(19)    The nature of the information or service to be supplied and the nature and importance of the information to a present or potential investigation, including whether the information can be corroborated.

(20)    The risk that the informant may adversely affect an investigation or potential prosecution.

(21)    The risk of physical harm that may occur to the informant, his or her immediate family, or his or her close associates as a result of assisting ATF.

(22)    Financial or other arrangements agreed to or expected by the informant in return for providing information or services to any Federal, State, or local agency, including ATF.

(23)    Whether the informant is a subject or target of a pending investigation.

(24)    Whether the informant poses a criminal threat or danger to the public.

(25)    Whether the informant poses a risk for flight.



    (26)    Whether the informant is a relocated witness.

    (27)    Whether relocation of the informant is anticipated.

b.    Unless extraordinary circumstances exist and are substantiated, the SAC shall not approve the following persons as ATF informants:

    (1)    Persons convicted of perjury.

    (2)    Persons under 18 years of age (juveniles). If a juvenile is approved for use, written consent must be obtained from a parent or guardian.

    (3)    News media representatives.

    (4)    Persons who have been adjudicated mentally incompetent, have a history of mental illness, or appear to be mentally or emotionally disturbed.

    (5)    Persons who are known or are believed to have given false information to law enforcement authorities in the past.

    (6)    Persons who have set preconditions for remuneration or other considerations that are unrealistic.

    (7)    Persons who have odious criminal records or reputations or who have personal character traits that would make them undesirable as informants.

    (8)    Persons who have been arrested for or convicted of sex crimes involving minors.

    (9)    Persons who are on active military duty. (See paragraph 9.)

    (10)    Persons on parole, mandatory release, or probation, unless prior approval of the appropriate parole/probation officials has been obtained. (See paragraphs 10, 11, and 12.)

4.    INFORMANT IDENTIFICATION AND CONTROL FILE.

a.    One of the most important responsibilities of ATF special agents is identifying and developing informants to the point where they will regularly contribute information.

b.    Special agents increase their personal hazard when working with an



informant whose identity is known only to themselves. If special agents are injured, killed, held hostage, etc., while working in connection with the informant, ATF would find it extremely difficult to undertake an investigation if the informant's identity and background information were not available. To ensure that this does not occur, all informants shall be identified and documented according to the provisions of this chapter. Only after identification, documentation, and approval by the SAC shall agents use an informant. In addition, all special agents, before personally contacting an informant (or potential informant), shall inform at least one ATF special agent or the resident agent in charge (RAC)/group supervisor (GS) of the informant's identity, the location where the informant will be contacted, and the expected duration of the contact. For the initial contact, special agents shall only meet with a potential informant if accompanied by at least one other law enforcement officer. (See subparagraph 4e.)

c.   Each field division shall establish an informant identification file. Additionally, ATF F 3252.1, Informant Control Log (Exhibit 1), shall be maintained under the SAC's direction in accordance with the security provisions outlined in ATF O 1720.1C, ATF Physical Security Program, and operations security principles. In addition to the SAC maintaining an informant identification file, each RAC/GS shall maintain a duplicate informant identification file. This file shall contain all correspondence on the informant and shall be maintained under the same security provisions previously outlined in this subparagraph.

d.   The informant identification file shall contain information on each approved informant, and ATF F 3252.1 will serve as a cross-reference index to the respective informant files.

e.   When a prospective informant is identified, the special agent, with at least one other law enforcement officer, shall meet with the potential informant for the initial contact. The special agent shall then request approval for use by directing a memorandum through his or her RAC/GS to the SAC addressing each factor outlined in subparagraph 3a(1) through (27). (See exhibit 2.) Attached to the memorandum shall be ATF F 3252.2, Informant Agreement (English Version) (Exhibit 3), or ATF F 3252.3, Informant Agreement (Spanish Version) (Exhibit 4), which all informants must read

and sign. Also attached shall be an informant photograph, FBI Form FD-249, and State, local, or FBI criminal record (rap sheets), if available. In an emergency, the request may be made by telephone, to be followed by a memorandum. A current informant photograph and the FBI Form FD-249 MUST be maintained in the informant control file and in the duplicate informant control file maintained by the RAC/GS at the field office where the informant is registered.

f. The information required under subparagraph 3a(1) through (27) and any subsequent information that may be required under paragraphs 1 through 7 of this chapter will constitute a respective informant control file. As new or additional personal information is developed, it should be included in that informant's file.

g. Requesting special agents must query the Treasury Enforcement Communications System (TECS) and National Crime Information Center (NCIC) and forward the original TECS/NCIC query responses to the SAC when requesting approval to use a prospective informant. The original TECS/NCIC query responses and/or FBI record check shall be included in the informant's identification file.

h. If the informant is approved, an entry shall be made on ATF F 3252.1 (exhibit 1) reflecting the name of the informant, the confidential identity code assigned to the approved informant [redacted] the name of the special agent requesting use of the informant, the date of approval, the date of semiannual verification, and the date of removal (to be completed when appropriate).

i. The SAC shall then notify the requesting special agent of approval to use the informant, through his or her RAC/GS, by signing and returning a copy of the requesting memorandum, which the RAC/GS shall retain as notification of approval. (NOTE: A copy of the memorandum shall also be submitted to the Chief, Intelligence Division, in an effort to maintain a central storage location for all informants.) These documents shall be maintained according to the security provisions set forth in ATF O 1720.1C.

j. After registration of the informant and documentation of instructions have occurred, one agent and at least one other law enforcement officer shall fully debrief the informant concerning his or her knowledge of criminal or other unlawful activities. When an informant is likely to provide

(9) b2 b7E

information that is subject to legal claim or privilege (e.g., privileged conversation between client/attorney), ATF will ensure prior coordination with an appropriate prosecuting attorney.

k.   The identification file for each approved informant shall be filed in the field division active file in numerical sequence of the assigned confidential identity codes used by that division.



l.   The assigned confidential identity code of an approved informant shall be used in all subsequent instances where reference is made to the respective informant (e.g., case reports, investigative reports, agent cashier fund reports, referrals). Exceptions to the aforementioned include situations resulting in the payment of money to the informant as generally the true name (or "alias") of the informant. (See chapter D of this order and ATF O 3251.1, Expenditure of Funds for Investigative Purposes.)

m.   Control and use of an approved informant may be transferred interdivision upon proper notification and approval of the SACs involved. However, transferring the respective informant identification file to the receiving field division is not necessary unless the informant is actually relocating to that division. The original confidential identity code assigned to the approved informant should be used when the informant is working temporarily in another field division.

5.   VERIFICATION/REMOVAL OF APPROVED INFORMANTS.

a.   Beginning the first week of January and July of each calendar year, the SAC shall ensure that all informant identification files are reviewed to determine the status of approved informants. Special agents shall be notified of their currently approved informants. Correspondingly, each special agent shall verify his or her respective list of informants by indicating which informants should be retained or removed from the files. Each special agent shall submit this semiannual verification, through his or her RAC/GS, to the SAC by memorandum. It must contain an

(10)   b2
       b7E

appropriate explanation regarding any informants who are to be retained or removed from active status. The semiannual report shall contain the cumulative amount of money paid to each informant during that 6-month period, as well as the case numbers in which he or she participated. Each informant must be documented on a separate memorandum. (See exhibit 5.)

b.    If an informant is arrested or believed to have engaged in unauthorized, unlawful conduct other than petty crime or a minor traffic offense, the SAC must review the continued use of the informant.

  (1)    If ATF is involved in an investigation with more than one Federal law enforcement agency using the informant, coordination among all of the relevant agencies' senior field managers should occur.

  (2)    In situations where a prosecutor is either (1) participating in the conduct of the underlying investigation using the informant or (2) working with the informant in connection with a prosecution, ATF must immediately inform the prosecutor of the arrest or the nature and extent of the alleged unauthorized, unlawful conduct.

c.    An approved informant shall not be recommended for removal as long as any investigation that he or she contributed to is still pending final disposition, even though that particular informant has been "unproductive" for an extended period of time. Further, when an approved informant is recommended for removal, a list of the case numbers that involved his or her cooperation shall be included in the request for removal, as shall the total amount of money paid to him or her.

d.    Unless extraordinary circumstances exist that would convince the SAC that the approval should continue, a previously approved informant shall be removed from the files when either of the following circumstances occur:

  (1)    It is determined that the informant falls within one of the categories listed in subparagraph 3b. In such instances, the responsible special agent shall document the facts in a memorandum and forward it to the SAC, through his or her RAC/GS.

  (2)    During the semiannual verification or prior thereto, the responsible special agent determines that an informant should be removed and

so notifies the SAC by memorandum, through his or her RAC/GS.

e.    Emergency removal may take place by telephone, followed as soon as possible by submission of a memorandum.

f.    When an informant has been removed, the SAC shall have that informant's identification file placed in an inactive status and filed according to the procedures described in subparagraphs 4c and k of this chapter. An entry shall be made in the "control log" reflecting the date removed. The SAC shall notify the requesting special agent, through his or her RAC/GS, of the removal by returning a signed copy of the requesting agent's memorandum with the notation "Informant Removed."

g.    The original memorandum that was submitted to the SAC to remove a previously approved informant shall be appropri-ately stamped "Informant Removed" and placed in the field division inactive file by numerical sequence, where it shall be retained according to ATF O 1345.1, Records Management Program and Records Control Schedule,    chapter G, item number 25. A copy of the memorandum shall be sent to the Chief, Intelligence Division. Informant files maintained by the field office shall be retained in compliance with ATF O 1345.1, chapter G, item number 47. At the end of the prescribed retention period, the file shall be shredded.

h.    When an informant is deactivated for cause (e.g., perjury, providing false information, etc.), that informant's relationship with ATF should be terminated. Appropriate notification shall be made to the informant if he or she reasonably can be located. Notification should be delayed if it would increase the risk that the informant or any investigative target would flee to avoid prosecution, risk the life or safety of any person, or jeopardize the viability of an ongoing or pending investigation or prosecution. At least two law enforcement officials must witness the notification. The notification must be documented in a memorandum. The memorandum, along with the informant's file, shall be forwarded to the Chief, Special Operations Division (SOD), where it will be stored. The informant's file shall be stamped "Informant Removed for Cause." A copy of the memorandum shall be forwarded to the Chief, Intelligence Division, to have the informant removed from the Headquarters active informant file. Additionally, an entry into TECS must be made indicating that the informant has been deactivated.

6.    GENERAL POLICY GUIDELINES.

a.  <u>Approval Requirements for Witness Security Program Participants</u>.  The Chief, SOD, must approve all requests within ATF for use of persons who are participating or have participated in the Department of Justice's (DOJ) Witness Security Program.  (See paragraph 7.)

b.  <u>Federal Inmates</u>.  The Chief, SOD's prior authorization shall be obtained before using Federal inmates as ATF informants.  (See paragraph 13.)

c.  <u>Investigative Activity Assigned a Case Number</u>.  All investigative activity assigned a case number shall be made a matter of official record, with all sources of information, including informants, properly identified by their assigned confidential codes.

d.  <u>Sensitivity of Information Pertaining to Informants</u>.  An informant's identity, information provided, assignments, and other pertinent matters are sensitive and shall be treated with the utmost security.  However, an informant may choose an open role (e.g., appearing as a witness or supplying information to other agencies), or the informant's participation in a violation may be such that it legally precludes anonymity.  It cannot be over-emphasized that the relationship with an informant requires the utmost discretion and demands from agents the highest degree of honesty, integrity, and tact.

e.  <u>Reliability of Information Provided by Informants</u>.

(1)  Every investigative avenue available should be pursued to ensure that information provided by an informant is reliable.  Special agents must ensure that it is they, not the informants, who direct investigations.

(2)  Special agents should be alert for dishonesty or false statements when an informant's testimony may be necessary for a successful prosecution.  Juries tend to discredit the testimony of such persons and anyone associated with them.

f.  <u>Criminal Activity by Informants</u>.

(1)  An informant shall not be used or encouraged to commit any act not authorized by ATF.  However, provided prior deputy assistant director (Field Operations) (DAD(FO)) authorization has been obtained, an informant may participate in criminal activities of persons under investigation to the extent determined by ATF and

prosecuting attorneys to be absolutely necessary to successfully complete the investigation, excluding acts of violence or any activity that would constitute obstruction of justice, including perjury, witness tampering or intimidation, entrapment, and the fabrication, alteration, or destruction of evidence. (For additional guidelines, see subparagraph 23d.) Care must be exercised in attempting to persuade persons to act as informants to avoid any allegations of undue influence.

(2)    Special agents are prohibited from initiating or condoning criminal activity by informants not authorized in the previous subparagraph. Informants shall be advised not to initiate any plan to commit a criminal act or to use any unlawful means to obtain information or material. Whenever a person has been arrested for or otherwise charged with a criminal violation, informants shall not be used to obtain information concerning that violation from the person charged or his or her legal representative without approval of a U.S. attorney.

(3)    Under no circumstances shall special agents knowingly take any action or refrain from taking any action with the purpose of concealing the commission of a crime by an informant.

g.    Matters Outside ATF's Primary Jurisdiction. Special agents shall instruct informants to confine themselves to matters within ATF's primary investigative jurisdiction, so far as possible. When informants provide information concerning planned criminal activity not within ATF's enforcement responsibility, special agents shall, without compromising the informants, expeditiously transmit that information to the appropriate enforcement agency.

h.    Informants' Involvement in ATF Functions. Informants shall be advised that they are not ATF employees. They shall not be issued any form of official identification or credentials and shall not be furnished firearms; however, they may be furnished firearms for use as props only when in situations authorized by the SAC and U.S. attorney to facilitate an undercover purchase of evidence. Adherence to operations security guidelines and extreme care must be exercised in dealing with informants to prevent them from having unauthorized access to official documents or otherwise becoming aware of and having the opportunity to obstruct ATF's

(14)

function.

i.   <u>Use of Law Enforcement Officers as Informants</u>. While law enforcement officers (whether Federal, State, or local) may be used as sources of information, they should not be documented as informants.

j.   <u>Informant Remuneration</u>.

(1)   Most informants expect some form of remuneration in return for information provided. In many cases, the only consideration expected is money. Therefore, once the information has been evaluated and the time and effort expended by the informant and/or the significance of any seizures or arrests has been determined, the procedures for payment provided in chapter D should be followed. Under no circumstances shall any payments to an informant be contingent upon the conviction or punishment of any person.

(2)   When an informant who is also a defendant requests some consideration of leniency in exchange for information, special agents are limited to advising the prosecutor and/or court in an appropriate manner, before trial, of what the defendant/ informant has done to assist law enforcement. ATF does not have authority to make any promise or commitment that would prevent the Government from prosecuting a person for criminal activity that is not authorized pursuant to this order.

(3)   All payments to informants shall be witnessed by another agent, sworn law enforcement officer, or State-certified fire investigator using ATF F 3251.1, Payment Receipt for Investigative Expenses, Informa-tion, and/or Treasury Check (Exhibit 6). (NOTE: Only under extenuating circumstances, with prior assistant special agent in charge (ASAC) approval, may an unaccompanied agent make a payment to an informant. The special agent shall denote the date and time approved in the witness section of ATF F 3251.1.):

(4)   Special agents shall not approach, directly or indirectly,

(15)   b2
       b7E

representatives of private industry and request assistance in paying money, gifts, or products of such companies to informants. Addi-tionally, agents shall not act as intermediaries between other law enforcement agencies and informants for the purpose of delivering money furnished to the informant by other enforcement agencies. If other enforcement agencies desire to pay ATF informants for information or services rendered, special agents are not precluded from arranging necessary contacts between the informant and the other enforcement agency, but the actual exchange of moneys shall be made directly between the informant and the respective enforcement agency, in accordance with the procedures established by those two parties. Likewise, ATF money shall be paid directly to an informant rather than through intermediaries.

k.    Informant Instability or Unreliability. When it appears that an informant shows indications of emotional instability or unreliability or has willfully furnished false, materially substantive information, the SAC shall be advised immediately. Depending upon the significance of the materiality and the impact on the problem, the SAC shall notify the appropriate DAD(FO).

l.    Meetings With Informants of the Opposite Sex. When possible, a minimum of two special agents should be used whenever meeting with an informant of the opposite sex. If possible, at least one of these two special agents should be of the same sex as the informant.

m.    Social or Personal Contacts. Under no circumstances are special agents to become involved with informants on a social or personal level. All contacts with informants should be limited to official business only.

n.    Unusual and/or Significant Matters. All unusual and/or significant matters involving approved informants must be reported immediately to the SAC. The SAC will determine if the matter should be reported to the appropriate DAD(FO). Matters that must be reported immediately to the appropriate DAD(FO) include but are not limited to the following: murder, bodily injury, threats of bodily harm, or property damage to informants or their families resulting from informant activities; informants' involvement in any felonious criminal activity; or informants' involvement in any sensitive matters as defined in chapter B of ATF O 3210.7C, Investigative Priorities,

Procedures, and Techniques.

7.    USE OF RELOCATED WITNESSES AS INFORMANTS. If ATF or any other
      agency has placed a person in the Witness Security Program, further use of that
      person in a new investigation shall be governed by the guidelines of this chapter.
      These guidelines apply even if all subsistence and support to the person have
      been terminated and the witness has been voluntarily or involuntarily separated
      from the program.

      a.    The Chief, SOD's approval must be obtained before any relocated
            witnesses may be used as informants or for any other assignment.
            Failure to observe this restraint could endanger the relocated witness,
            obligate ATF to major expenditures, or provoke a civil action against ATF.
            For the purpose of this order, a "relocated witness" is a person who has
            been officially relocated by DOJ pursuant to Justice Department Order
            O.B.D. 2110.2.

      b.    When it is suspected that a prospective or approved informant is a
            relocated witness, the SAC shall immediately notify the Chief, SOD, who
            shall contact DOJ, Office of Enforcement Operations (OEO). Approval for
            use will be made by the assistant attorney general who authorized the
            witness protection. Without such approval, the relocated witness shall not
            be used or contacted further.

      c.    Requests made by the SAC to use relocated witnesses as informants will
            be considered by OEO on a case-by-case basis. When requesting the
            use of relocated witnesses as informants, the SAC must include the
            following information in the request to the Chief, SOD, so that OEO may
            make an informed judgment:

            (1)    The name of the informant or person relocated.

            (2)    Alias(es) used by the informant.

            (3)    Approval of the appropriate headquarters official of the concerned
                   agency.

            (4)    If the informant is not a witness, the relationship of the informant to
                   the witness and the name(s) of the witness(es).

            (5)    Identifying data on the informant (e.g., date of birth, place of birth,
                   Social Security number, FBI number, Bureau of Prisons register

17

number, and sex).

(6)    Whether the informant left voluntarily or was removed from the Witness Security Program.

(7)    The informant's employment. If unemployed, include how the informant is subsisting and the extent to which this activity jeopardizes the informant's livelihood.

(8)    The name(s) of the target(s) of the investigation, including his or her role in the crime, or the organization under investigation.

(9)    The significance and/or scope of the criminal activity and the target(s).

(10)    The informant's relationship or association with the target(s) under investigation.

(11)    Whether the informant is able to report substantial information concerning significant criminal activity.

(12)    The necessity of using the informant in the investi-gation, including details about the nature of the use being requested.

(13)    Whether information or assistance that the informant may be able to contribute may prevent the death of another person.

(14)    ~~The consideration of alternatives to the informant's use and an~~ indication of why they will not work.

(15)    A detailed account of the informant's involvement in criminal activity subsequent to being approved for Witness Security Program services.

(16)    An appraisal of whether the request centers on the informant's new criminal involvement and how the informant is aware of the new criminal activity.

(17)    Whether the informant will become involved in criminal activity by acting as an informant.

(18)    Whether the informant wants to furnish information/ assistance to the Government because of the belief that he or she may be apprehended for participating in a crime.

(19)  The benefit that the informant expects in return for his or her cooperation.

(20)  A statement as to whether the informant's activity requires him or her to testify.

(21)  An indication as to whether the informant completed the testimony for which he or she was placed in the Witness Security Program.

(22)  Details about other agencies' use of the informant since his or her relocation.

(23)  The probation or parole status of the informant, including whether the U.S. Probation Office and the U.S. Parole Commission should be notified.

(24)  The security measures to be taken to ensure the informant's safety and to minimize the risk to the public.

(25)  Use of electronic devices, bodywires, etc.

(26)  The number of law enforcement agents assigned to the security detail.

(27)  The length of time that the informant will be needed.

(28)  Whether the informant is incarcerated. If so, whether the prosecutor and/or judge should be advised.

(29)  If the informant is a prisoner, the location of his or her incarceration.

(30)  If the informant is a prisoner, whether he or she will remain in the custody of the investigative agency, be housed in jails or similar facilities at certain times, or be unguarded (except for his or her protection).

(31)  If the informant is a prisoner, whether a prison redesignation will be necessary upon completing the activity.

(32)  If the informant is represented by counsel, whether counsel concurs with the activity.

(33)  If applicable, whether the activity has been endorsed by the appropriate Federal/State prosecutor. If so, provide the name,

telephone number, and location of the prosecutor.

    (34)    Whether the informant activity will require submission of a new Witness Security Program application and a subsequent relocation.

    (35)    Whether the informant will be charged/indicted in this investigation.

d.    Once the Chief, SOD, approves the request, he or she shall forward it to OEO for DOJ approval before the person may be used as an informant.

e.    If a relocated witness is approved for use, a monthly status report shall be submitted by memorandum to the Chief, SOD, detailing the witness' activities and the results of his or her activities. The report should also reflect anticipated additional time needed for use of the witness as an informant.

f.    The Enforcement Support Branch shall maintain a centralized alphabetical file of relocated ATF witnesses/informants.

8.    USE OF FOREIGN NATIONALS AS INFORMANTS. Once it is determined that a person is not a U.S. citizen, the SAC's approval must be obtained before that person may be used as an informant. If the person is an illegal alien, the SAC shall contact the agent in charge of the Immigration and Naturalization Service (INS) for the area where the alien resides to obtain the appropriate documents authorizing the prospective informant to remain legally in the United States. Requests for approval must contain the information required in subparagraphs 4e and 10c.

9.    USE OF MILITARY PERSONNEL AS INFORMANTS.

a.    The Posse Comitatus Act (18 U.S.C. section 1385) establishes prohibitions against the use of the military (Army and Air Force) to enforce civilian laws. Although the act is not applicable to the U.S. Navy or U.S. Marine Corps, a circuit court decision stated that repeated cases involving the use of the military to enforce civilian laws might require the court to impose the exclusionary rule. Thus, this ruling has been defined to include the U.S. Navy and U.S. Marine Corps.

b.    This act does not apply to the Coast Guard, since it is under the Department of Transportation during peacetime and is considered a civilian organization. Unless absolutely vital, active duty members of the Coast Guard should not be recruited or used as informants.

c.      In view of the prohibitions imposed, special agents shall not use active duty military personnel in an ongoing criminal investigation arising under laws administered by ATF without prior approval from the SAC and concurrence of the U.S. attorney.  This does not preclude military personnel from providing technical assistance, such as deactivating bombs, or from furnishing information concerning a criminal violation, and it does not prohibit ATF from using military storage facilities to store firearms or explosive materials.

10.    **USE OF FEDERAL OR STATE PROBATIONERS, FEDERAL MANDATORY RELEASEES, FEDERAL PAROLEES, AND FEDERAL OR STATE SUPERVISED RELEASEES AS INFORMANTS.**

a.      Before using a Federal or State probationer, Federal mandatory releasee, Federal parolee, or Federal or State supervised releasee as a cooperating individual/ informant, the RAC/GS shall determine if the use of that person in such a capacity would violate the terms and conditions of the person's probation, parole, or supervised release.  **(For use of persons on State parole, see paragraph 12.)**  The RAC/GS is encouraged to consult with appropriate prosecutors before making such a determination.  The determination shall be documented in the informant file.  If it is determined that there would be a violation of probation, parole, or supervised release before using the person as an informant, the RAC/GS must obtain the permission of the relevant probation, parole, or supervised release official, which also shall be documented in the informant identification and control file.  If permission is denied or it is inappropriate to contact the appropriate official, authorization for such use from the court or a supervisor of a probation, parole, or supervised release official may be obtained.

b.      When a Federal or State probationer, Federal mandatory releasee, Federal parolee, or Federal or State supervised releasee offers to cooperate with ATF, a special agent shall conduct a preliminary interview, without commitment or promise.  This interview shall be made with prior approval of the potential informant's parole officer.

c.      After completing the interview and subsequent evaluation, if the special agent wishes to proceed, he or she shall submit a request to the SAC. The request shall include the subject's personal history, an evaluation of the subject, the intended operational use, the types of operational and administrative control factors, the expected or potential danger to the subject, an assess-ment of the potential chances for success, and the

21

specific period of time that the subject will be used.

d.    The SAC shall contact the regional director of the Federal Parole Commission or the State parole board of the region where the Federal or State probationer, Federal mandatory releasee, Federal parolee, or Federal or State supervised releasee is under supervision. He or she shall furnish a written overview of the investigative plan, including the proposed use of the potential informant's services, the agency's proposed operating instructions to him or her, the agency's administrative controls, and evaluation of risk to the subject and plans to combat such risk. Requests for consideration for use of a probationer's, mandatory releasee's, parolee's, or supervised releasee's services will be made for a specified time period.

e.    If the Parole Commission or the State parole board grants the request, the degree and conditions of the Federal or State probationer's, Federal mandatory releasee's, Federal parolee's, or Federal or State supervised releasee's cooperation shall be set forth. An indepth briefing shall be conducted with the potential informant concerning his or her relationship with ATF, the intended objective, and the stipulations and terms of the regional director of the Parole Commission's or the regional director of the State parole board's concurrence. In most instances, the conditions imposed include the following:

(1)    The use of the probationer's, mandatory releasee's, parolee's, or supervised releasee's services in this capacity is to be for a period of 90 days and only in connection with the particular investigation for which he or she is authorized.

(2)    The SAC will furnish the regional director of the Parole Commission or State parole board a comprehensive report at the end of each 30-day period reflecting the progress of the investigation; the cooperation and effectiveness of the probationer, mandatory releasee, parolee, or supervised releasee; and the amount, if any, of financial remuneration.

(3)    The probationer, mandatory releasee, parolee, or supervised releasee is not to participate in any illegal activities during the period in question.

(4)    Prior approval from the regional director of the Parole Commission or the State parole board must be secured before the probationer,

22

mandatory releasee, parolee, or supervised releasee may be used in any manner that might jeopardize his or her safety or cause him or her to violate any of the conditions of his or her parole.

(5)   At the end of the 90-day period or other termination date of usage, the SAC shall give the regional director of the Parole Commission or the State parole board a complete report that shall indicate, to the extent possible, the probationer's, mandatory releasee's, parolee's, or supervised releasee's cooperation in the specific investigation and the status of the investigation.

(6)   If circumstances develop that indicate an extension of the specified time period would be in the interest of the Government, the SAC will provide a written request with appropriate justification to the regional director of the Parole Commission or the regional director of the State parole board.

f.   During the period of cooperation, the SAC is responsible for testing and assessing the relationship to ensure that the Federal or State probationer, Federal mandatory releasee, Federal parolee, or Federal or State supervised releasee is not violating his or her operational instructions. The SAC shall bring violations to the attention of the regional director of the Parole Commission or the regional director of the State parole board and may result in immediate termination of use. Additionally, a change of the investigative plan that would require a significant change in operating instructions to the probationer, mandatory releasee, parolee, or supervised releasee shall require the approval of the regional director of the Parole Commission or the State parole board.

g.   The probation officer or the sentencing judge shall be consulted before using a person on Federal probation.

h.   No special agent shall contact the U.S. attorney's office requesting the reduction of bail for a person who is or will be providing information to ATF without receiving prior approval of the SAC or ASAC.  Great care should be taken when seeking a reduction in bail, comparing the information that the person can provide against the charges that are pending (e.g., armed robbery, sex offense, etc.).

11.   <u>USE OF STATE OR LOCAL PRISONERS</u>.  ATF shall comply with any applicable State or local laws, rules, and regulations pertaining to using State or

local prisoners as cooperating individuals/informants.

12.   USE OF PERSONS ON STATE PAROLE.

   a.    Special agents must obtain the supervisory parole officer's approval
        before using and registering an informant who has been convicted of
        State violations and who is currently on parole.  State restrictions may
        exist on using the person as an informant.  Additionally, when registering
        the person as an informant, the criminal history section of the registration
        form shall be completed, and the crime for which the person is on
        probation shall be highlighted.

   b.    No special agent shall contact any State or local prosecutor requesting
        the reduction of bail for a person who is or will be providing information to
        ATF without receiving prior approval of the SAC or ASAC.  Great care
        should be taken when seeking a reduction in bail, comparing the
        information that the person can provide against the charges that are
        pending (e.g., armed robbery, sex offense, etc.).

13.   USE OF FEDERAL INMATES IN INVESTIGATIONS.

   a.    In causing a Federal inmate to be remanded into ATF custody, ATF
        assumes a great responsibility.  Should the inmate or the general public
        experience personal injury and/or death while the inmate is ATF's
        responsibility, liability may arise under the Federal Employees'
        Compensation Act or the Federal Tort Claims Act.  There is also a
        potential for adverse publicity.  Therefore, prudent decisions must be
        made when considering such requests.

   b.    The Chief, SOD's approval shall be obtained before any Federal inmate
        may be used as an informant or for any other assignment on behalf of
        ATF.  When making such requests, the SAC shall submit a memorandum
        to the Chief, SOD, who shall make a recommendation to DOJ, OEO.
        Approval for use will be made by the assistant attorney general, in
        conjunction with the Director of the Bureau of Prisons.

   c.    The Bureau of Prisons and OEO have specific guidelines on using
        Federal inmates in criminal investigations.  Initial contact should be made
        by ATF with local Bureau of Prisons officials concerning the potential use
        of Federal inmates being held in their facilities.  All requests for using
        Federal inmates in investigations must be coordinated with the
        Enforcement Support Branch.  When a special agent determines the need

to use a Federal inmate in an investigation, he or she shall prepare a memorandum to the SAC addressing the following:

(1)    The location of the inmate (name of the correctional facility).

(2)    Identifying data on the inmate (e.g., date of birth, Bureau of Prisons number, Social Security number, sex, etc.).

(3)    The charges for which the inmate is incarcerated, including sentence date and length of sentence.

(4)    A copy of the inmate's arrest record or summary of the arrest record must be attached.

(5)    An explanation of the necessity of using the inmate in the investigation, including other techniques that have been tried and the reasons why they have failed.

(6)    The name(s) of the target(s) of the investigation, including role in the crime, organization under investigation, identifying data on the target(s), and summary of criminal history.

(7)    The inmate's relationship or association with the target(s) under investigation.

(8)    Whether the target(s) is aware of the inmate's incarceration status. Include the inmate's cover story to avoid jeopardizing his or her safety or the investigation.

(9)    An indepth explanation of the nature of the activity being requested, including the type of electronic surveillance equipment that will be used and how it will be used (if applicable).

(10)    The security measures to be taken to ensure the inmate's safety, alleviate the risk to the public, and prevent the inmate's escape.

(11)    The length of time the inmate will be needed in the activity.

(12)    Whether the inmate will be needed as a witness, including whether he or she will be considered for the Witness Security Program.

(13)    Whether a prison redesignation will be necessary upon completing the activity.

(14)    Whether the inmate will remain in the custody of the investigative

agency or be housed in jails or similar facilities at certain times.

    (15)    The number of special agents and other law enforcement agency personnel assigned to the security detail.

    (16)    Whether the appropriate Federal/State prosecutor has endorsed the request. If not, explain why. If so, provide the name, phone number, and location of the prosecutor who is endorsing the request.

    (17)    If the inmate is represented by counsel, whether counsel concurs with this activity.

    (18)    Whether the inmate will engage in the warrantless interception of certain categories of verbal communications as specified by the Attorney General.

    (19)    Whether entrapment and <u>McDade</u> issues have been discussed with the assistant U.S. attorney. If there are no issues, give a brief statement to this effect.

d.    If the SAC concurs, the memorandum will be forwarded to the Chief, SOD, for approval.

e.    If the Chief, SOD, concurs, the request will be forwarded to DOJ, OEO. OEO will make a recommendation to the Director, Bureau of Prisons, as to the merits of the request. OEO will notify the Chief, SOD, of the Bureau of Prisons' decision.

f.    The warden of the facility in which the inmate is held will, if the request is approved, contact the identified case agent and coordinate the activity. Any exceptional security problems that prohibit notifying the warden of the inmate's assistance to ATF must be explained in the original request.

g.    Progress reports shall be submitted to the Chief, SOD, if a continuance is necessary.

h.    Sealed court order(s) to remove an inmate from prison will be obtained only after OEO approves the request.

i.    The Enforcement Support Branch shall maintain a centralized alphabetical file of assisting Federal inmates.

j.    A report prepared by the special agent detailing the results of the inmate's

activity shall be submitted through channels to the Chief, SOD, within 14 days of the conclusion of inmate assistance. This report will be forwarded to OEO, Criminal Division, DOJ.

14.    UNDESIRABLE/UNRELIABLE INFORMANT FILE.

   a.    To effectively guard against persons posing as informants to infiltrate ATF for the purpose of gaining intelligence on current investigations, to steal agent cashier funds, or to commit any other such actions, an "undesirable/ unreliable informant" file will be maintained in TECS.

   b.    When any informants are suspected or known to be undesirable or unreliable, their services shall be discontinued immediately. Special agents making the determination shall immediately notify their SAC by memorandum, accompanied by a Personal History/TECS Input form, completed as fully as possible. The memorandum shall document the reasons for the "undesirable/ unreliable informant" determination and shall contain the information required in paragraph 5. The Personal History/TECS Input form must contain the profile code "INF" in scan line 47. SACs will review the information and, if they concur, enter the information into TECS. In doing so, scan line 41 should contain the remarks "Undesirable. Contact (name of entering field division) for further information." SACs will then follow the procedures outlined in paragraph 5.

   c.    If it is determined that any informants should be deactivated or their relationship with ATF should be terminated for cause, appropriate notification shall be made as per subparagraph 5h.

15.    THE INFORMANT AND THE DISCLOSURE ISSUE.

   a.    Informants' identities and informant identification and control files are not normally subject to disclosure. However, personal information informants furnish about another, which becomes a part of an ATF record system, could become subject to disclosure under the Privacy Act. Disclosure of personal information to informants during the course of any information exchange is a Privacy Act disclosure. Disclosing special agents must account for the disclosure in accordance with the procedures outlined in ATF O 9000.1, Office of Liaison and Public Information. Informants' true names need not be a part of the accounting; aliases or assigned identity codes may be substituted.

27

b.   If informants are present during the commission of a crime or accompany special agents working in an undercover capacity during a violation, they would become part of the "res gestae" in the case and must be identified. Under these circumstances, informants then become prospective witnesses.

(1)   A signed statement should be obtained from informants/witnesses for inclusion in the case report. In situations where it is believed that continuing protection must be given to informants for their safety, their addresses and present places of employment need not be revealed in the written statement. A showing of clear and present danger will justify a court ruling for protecting witnesses from disclosing this information on cross-examination.

(2)   If special agents are unable to obtain a signed statement, they should submit a detailed account of the informant's expected testimony in an ATF F 3120.2, Report of Investigation, which should be included with the case report.

(3)   Demands to identify informants before any legal proceedings should be handled in the same manner as requests for information that are subject to the provisions of 27 C.F.R. section 71.21(b), 18 U.S.C. section 1905, and 27 C.F.R. section 71.27(e).

(4)   The legal principle involved in disclosing or keeping confidential names of informants is a need to balance public interest in protecting the flow of information to investigative agencies with the rights of defendants to prepare their cases. No fixed rule exists with respect to disclosing informants' names. The courts apply the "interest balancing" test to the particular circumstances involved.

(5)   Where prosecution is contemplated in matters in which information has been received from informants who requested anonymity and the U.S. attorney can give no assurance of his or her ability to protect informants' identities, no further action shall be taken by ATF until the appropriate DAD(FO) can be advised and the case discussed with DOJ.

(6)   Informants shall be advised that they are not to attempt to be present during conversations between persons under criminal indictment and their attorneys. If they are inadvertently present and learn of defense plans or strategy, they shall be informed that

they are not permitted to report such conversations without prior approval from the U.S. attorney.

c.   To ensure maximum security in ATF offices, all informant communications, claims for reward, reports, memorandums, or documents identifying informants shall be stored according to the security provisions outlined in ATF O 1720.1C as well as operations security principles. Access shall be limited to persons responsible for security of the aforementioned documents. Personnel to whom the identity of informants becomes known or who receive information that identifies an informant shall treat such information as highly confidential in nature and shall exercise security precautions as required for those primarily responsible.

d.   To ensure operations security and to protect informants' identities, informants shall be escorted at all times while inside an ATF office, command post, offsite, or at any other location where they could gain unauthorized access or become privy to sensitive documents, the identities of other ATF confidential informants, or ATF information systems.

16.   INFORMANT/WITNESS PROTECTION AND RELOCATION (ATF).

a.   Protection and Refusal. Each special agent has a duty and an obligation to make every effort to protect informants/witnesses, their dependents, and their property at all times, particularly when it becomes known or suspected that informants/witness' identities are known by those against whom they may testify. Failing to take adequate safeguards may cause great expense to ATF and could result in successful civil actions against the Bureau. (See Swanner v. United States, 309 F. Supp, 1183 [M.D. Ala. 1970].) Liability may arise under the Federal Employees' Compensation Act or the Federal Tort Claims Act. When informants/witnesses refuse protection after being advised by a special agent that a clear and present danger to their safety exists, the U.S. attorney should be advised immediately. The special agent should document the circumstances, noting the date and the time that informants/witnesses were advised of the danger and refused protection. When possible, informants/witnesses should be asked to sign a statement indicating their refusal to accept protection.

b.   Expenses. Good judgment should be exercised to avoid suggestions to

informants/witnesses that might cause them to become unduly alarmed over their safety. However, when circumstances indicate that informants/witnesses, their dependents, or their property is in danger, the special agent shall take whatever immediate action he or she deems necessary. If it is not possible to contact the SAC before taking protective action, then the SAC must be notified as soon as possible after the action has been taken. ATF protection will continue until such time as the SAC determines that a valid threat no longer exists or the informants/witnesses are transferred to the U.S. Marshals Service's custody upon authorization by the Attorney General. When informants/witnesses are taken into protective custody or relevant expenditures are incurred, they shall be reported immediately to the SAC. The SAC must approve all expenses incurred for witness/informant subsistence, travel, and relocation. Funds for these expenditures will be drawn from the ATF Agent Cashiers Fund. Requests for these funds must be made through the SAC using ATF F 3251.3, Request for Advance of Funds.

17.    RESERVED

18.    WITNESS SECURITY PROGRAM PROCEDURES (U.S. DEPARTMENT OF JUSTICE).

   a.    Guidelines. The Witness Security Reform Act of 1984 continues the authority of the Attorney General to establish guidelines for use by U.S. attorneys to provide protection and security by means of relocation for witnesses, their relatives, and associates. The responsibility for the security and maintenance of a protected witness and his or her dependents and associates rests with the U.S. Marshals Service and DOJ's OEO. Requests for protection of a witness, etc., must be made through the U.S. attorney. DOJ policy requires that protection of a witness and family members and associates in a local or State police matter be handled by those authorities. Exceptions to this policy will be allowed only upon the finding of the assistant attorney general of the concerned division that the proposed witness meets all of the following conditions:

      (1)    The person is a qualifying witness in a specific case in process, or during or after a grand jury proceeding.

      (2)    Evidence in possession indicates that the life of the witness and/or that a member of the witness' family or household is in immediate jeopardy.

30

(3)    Evidence in possession indicates that it would be in the Federal interest for DOJ to protect the witness and/or a family or household member.

b.    Procedures.

(1)    Requests to place a person and his or her family and associates in the Witness Security Program must be made to the U.S. attorney. No ATF employee is authorized to make representations or promises, either expressed or implied, to prospective witnesses regarding Witness Security Program services with the intent to elicit their cooperation as Government witnesses.

(2)    When it is known that the U.S. attorney is recommending an ATF witness for the program, the case agent shall immediately prepare a threat assessment or threat/risk assessment memorandum (see exhibits 7 and 8) and forward it to the SAC for review. The SAC shall forward the memorandum, along with his or her written recommendation, to the Chief, SOD.

(3)    If the prospective witness is a prisoner, a threat assessment must be completed (exhibit 7). Once this prisoner is released from custody, and if it is determined that additional program services are necessary, then a risk assessment will be needed. If the witness is not a prisoner, then a threat/risk assessment (exhibit 8) must be completed. Separate threat/risk assessment memorandums are required for each family member or associate who will be entering the program with the witness/because of a witness' participation. A threat/risk assessment memorandum must contain the following information:

(a)    Threat Assessment.

1    A statement that the appropriate U.S. attorney has recommended the witness for participation in the program.

2    The facts of the specific case or cases in progress, including the role of the recommended witness, the record and reputation of the defendants, the criminal organization, their illegal activities, and the involvement of any other agencies in the

31

investigation.

3    Detailed information on the threat, whether direct or potential, to the witness and his or her family as a result of his or her cooperation with the Government.

4    Names and identifying data for all persons who may pose a danger to the witness. (See subparagraph (10), below.)

5    The criminal record and reputation of the recommended witness.

6    If the witness is a prisoner, a statement as to whether a change of identity is necessary or whether the Central Monitoring Program would satisfy safety concerns. This program ensures separation of the prisoner from other prisoners or visitors who pose some level of risk to his or her personal safety.

7    The names of any relatives or members of the household of the principal witness, including their criminal backgrounds, and information documenting the threat against their safety.

(b)    <u>Risk Assessment</u>.

1    Significance of the investigation or case in which the witness is cooperating.

2    The relative importance of the witness' testimony.

3    Whether the prosecutor can secure similar testimony from other sources.

4    The alternatives to program use (such as a lump-sum relocation) that were considered and why they will not work. What capability does the person posing the threat have that a complete change of identity is required to ensure the witness' safety?

5    The possible danger to other persons or property in the relocation area if the witness is placed in the program. Any prior criminal behavior must be

32

addressed. (Applies to the witness and his or her family members.)

<u>6</u>    Whether the need for the witness' testimony outweighs the risk of danger he or she may pose to the public. (Applies to the witness and his or her family members.)

<u>7</u>    If minor children are involved, whether any child custody issues need to be addressed. (See subparagraph (13), below.)

(4)    The Chief, SOD, will forward the threat/risk assessment, with his or her recommendation, to OEO.

(5)    To expedite approval of requests to place persons in the program and to relieve ATF of the costly responsibility of protecting witnesses for lengthy periods of time, the SAC shall ensure that threat/risk assessments are submitted to the Chief, SOD, as soon as it becomes apparent that program services will be needed. Conditional approval may then be obtained, allowing witnesses to continue their undercover activities and yet permitting their entry on an expedited basis when their cooperation becomes known or indictments are returned. The SAC will forward to the Chief, SOD, timely reports of significant occurrences (e.g., search warrants, arrests, indictments, and convictions) involving any person recommended for the program.

(6)    No State or local witness will be admitted to the program unless the State or locality fully reimburses the U.S. Marshals Service for the total cost of services rendered.

(7)    Upon request, the case agent shall produce the witness and adult family members (those being considered for relocation) for a preliminary interview at a site selected by the U.S. Marshals Service. Also present will be the assistant U.S. attorney who is recommending the witness. The case agent, in close cooperation with the U.S. attorney, shall thoroughly debrief each person recommended for the program. The debriefing should include all areas of knowledge the witness may have concerning criminal activity. The special agent shall submit a written report of the debriefing, including to whom the information has been

(33)

disseminated, to the SAC, who will forward it to the Chief, SOD, within 14 calendar days of submitting the threat/risk assessment.

(8) The case agent will be required to produce the witness and adult family members/associates for psychological testing by a Bureau of Prisons psychologist. All appointments will be coordinated through the Chief, SOD. The psychologist will not know the witness' and family members' true names and, as a security requirement, will refer to them by an OEO-assigned code number. Copies of the psychological tests will be made available to the prosecutor for a determination as to any Brady problems.

(9) A polygraph examination is required of all Witness Security Program candidates who are incarcerated or will be incarcerated in the near future. If this occurs, the case agent may be asked to arrange to have a polygraph examination administered. Authorization for the Witness Security Program may be rescinded if the results of the examination reflect deception indicating that the candidate intends to harm or disclose other protected prisoner-witnesses or information obtained from such witnesses.

(10) The case agent shall assist the sponsoring attorney in providing the following information to OEO on all persons who have been identified as posing a threat to the witness and who are in or are likely to come into Federal custody. This essential information will enable the Bureau of Prisons to determine the appropriate institution for safe housing of a prisoner-witness and to monitor the separation needs of protected prisoner-witnesses.

    (a)    Name.

    (b)    Alias.

    (c)    Date of birth.

    (d)    FBI number.

    (e)    Race.

    (f)    Sex.

    (g)    Ethnic origin.

      (h)     Offense/charge.

      (i)     Current status (appeal, fugitive, unincarcerated).

(11)    Upon submitting a Witness Security Program application for an illegal alien, the sponsoring attorney or case agent must obtain from the INS appropriate documents that authorize the prospective witness and family members to remain in the United States and facilitate relocation by the U.S. Marshals Service out of the State in which they registered. Witness Security Program candidates who are illegal aliens cannot be relocated by the U.S. Marshals Service until all documents have been provided to OEO or the U.S. Marshals Service. In cases where the INS procedure to legalize the alien status may require a lengthy time period, the sponsor or agent should secure from the INS a letter of intent to change the witness status as part of the requirements for relocation under the Witness Security Program.

(12)    The Witness Security Reform Act of 1984 authorizes a Federal probation officer, upon the request of the Attorney General, to supervise any person provided protection under 18 U.S.C. chapter 224 section 3521 who is on probation or parole under State law if the State involved consents to such supervision. To have a State parolee or probationer supervised under Federal jurisdiction, the State must provide written consent to such supervision. The case agent should assist in obtaining from the State specific documents needed for proper supervision of a State parolee or probationer.

      (a)    Documents needed for State parolees include a presentence or background report detailing the circumstances of the instant offense and prior criminal conviction history, a sentence date record indicating the type and length of sentence imposed by the State court, a signed parole or release certificate, and all available institutional materials, such as progress reports and classification materials.

      (b)    Documents needed for State probationers include a presentence or background report detailing a description of the instant offense and prior criminal conviction history, the order of probation from the court indicating the sentence of

probation imposed with signed conditions of release, and any other pertinent materials.

(c) A State parolee or probationer cannot be relocated out of the sentencing State without these documents and written consent from the supervising State releasing supervision to Federal authorities.

(13) The Witness Security Reform Act of 1984 provides that a child may not be relocated unless the parent to be relocated (the "program parent") has legal custody. Court orders concerning custody and visitation must be obtained and reviewed before relocation of the child is allowed to ensure that compliance with the order is possible. If compliance is not possible, the program parent must initiate legal action to modify the order. The case agent must obtain from the program parent all legal custody documents that are required under the act. Where possible, these documents must be submitted to OEO with the Witness Security Program application. If the legal custodial parent's location is unknown, the case agent must make good faith efforts to locate the parent for the purpose of obtaining a legal custody change and/or written consent to the child's relocation by the U.S. Marshals Service for security reasons.

(14) Case agents should make requests for the appearance of a protected witness through the sponsoring U.S. attorney for approval. Normally, witnesses in the program will not be returned to a danger area for conferences or meetings. Agents shall conduct interviews in neutral sites selected by the U.S. Marshals Service. Exceptions to the use of a neutral site for interviews must be requested, in writing, by the Chief, SOD, to OEO. If approved by OEO, the requesting office may be required to provide the necessary security for the witness. Exception requests must be submitted at least 10 working days before the meeting and must include detailed explanations of why exceptions are necessary.

(15) After the use of a relocated witness has concluded, the case agent shall forward to the SAC a summary of results obtained through the use of the witness. This report shall include actions taken by other agencies based on information referred to them by ATF. The SAC shall forward this report to the Chief, SOD, after receipt. The

36

following should be addressed:

(a)　Name of the witness.

(b)　Name of the case.

(c)　Jurisdiction.

(d)　Did the witness testify before grand jury?  Trial?  If the witness did not testify, why not?

(e)　Status of the witness in the case:

    <u>1</u>　Defendant.

    <u>2</u>　Unindicted coconspirator.

    <u>3</u>　Prisoner.

    <u>4</u>　Victim.

    <u>5</u>　Other.

(f)　Names of all defendants.

(g)　Statutory violations charged.

(h)　Date of indictment.

(i)　~~Date of conviction.~~

(j)　Disposition of the case as to each defendant.

(k)　If convicted, the details of the sentence imposed on each defendant, including fines levied, etc.

(l)　Any information as to significant forfeitures or seizures accomplished because of the assistance of the witness.

(m)　Any information as to contributions made by this witness to the law enforcement effort (Federal, State, and local) in your field division and elsewhere as a result of your request to place the witness in this program (e.g., furnishing probable cause for Title IIIs, search warrants, locations of fugitives).

(16)　If a former program participant is involved in criminal activity after



relocation and is convicted of a State offense, he or she will not be accepted into Federal custody (via the Witness Security Program) unless the State authorities involved advise OEO that they cannot keep him or her safe either in their own facilities or through transfer to another State. OEO will arrange, through the sponsoring investigative agency, to have the State authorities provided with background information concerning the witness cooperation so that they may provide for his or her security needs.

(17)   The Enforcement Support Branch shall maintain a centralized alphabetical file of relocated witnesses.

19.   <u>TRAINING</u>. Because of the sensitivity and danger involved when using informants, special agents are required to have proper training in developing, using, controlling, and paying informants before being assigned duties requiring the control of informants. Successfully completing New Professional Training and the Criminal Investigator Training Program are the minimum training required.

20   RESERVED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WILLIE E. BOYD,                          )
                                         )
        Plaintiff,                      )
                                         )
      v.                             )    Civil Action No. 05-1096 (RMU)
                                         )
BUREAU OF ALCOHOL, TOBACCO,              )
FIREARMS, AND EXPLOSIVES,                )
                                         )
        Defendant.                      )
_____)

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff's opposition to defendant's motion for summary judgment fails to establish any genuine issue of material fact or legal reason why that motion should not be granted.   Each of his developed arguments is addressed below.  Defendant's motion should be granted.

Plaintiff initially complains about withholdings ATF made on the ATF Manual on Confidential Sources. Pl.'s Opp. at 9-11.[1]  Plaintiff fails to acknowledge that the document is intended for use by its employees and agents in the course of carrying out ATF's law enforcement duties.  Exemption 7(E)'s second clause expressly protects "guidelines for law enforcement investigations or prosecutions if [their] disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  Accordingly, this clause of Exemption 7(E) protects any "law enforcement guideline" that pertains to the prosecution or investigative [stage] of a law enforcement matter whenever its disclosure "could reasonably be expected to risk

_____

[1]  Plaintiff's objection to the document being marked on each page with "FOIA" is not [proper]. Pl.'s Opp. at 9.  A release under the FOIA is a release to the world. See National [Archives] and Records Admin. v. Favish, 541 U.S. 157, 170-71 (2004).  Absent such markings, [inter]nal documents could be easily falsified and, as demonstrated in Plaintiff's Exhibit E, [inclusion] of such markings does not impair the release of the responsive information.

**Appendix-B**

vention of the law." See, e.g., PHE, Inc. v. United States Dep't of Justice, 983 F.2d 248,

251 (D.C. Cir. 1993) ("release of FBI guidelines as to what sources of information are available

to its agents might encourage violators to tamper with those sources of information and thus

inhibit investigative efforts"); Jimenez v. FBI, 938 F. Supp. 21, 30 (D.D.C. 1996) (applying

Exemption 7(E) to gang-validation criteria used by Bureau of Prisons to determine whether

individual is gang member). Hence, the portions of the Manual on Confidential Sources

directing and instructing ATF employees on ATF's techniques are properly withheld.

Plaintiff next objects to ATF's exclusion of a file identified as File DF 58822 from the

universe of documents reviewed and processed in response to the FOIA request which is the

subject of this action. Because File DF 58822 was compiled by the Office of Chief Counsel

during the litigation of Civil Action No. 99-2712 (JR), it contains only duplicate copies of

documents from the other ATF files. 2d Chisholm Dec. ¶ 14. Consequently, reviewing that file

in addition to plaintiff's complete criminal file would not result in any additional information

being released to plaintiff, and instead would duplicate the effort already undertaken. The FOIA

should not be applied to require fruitless acts, especially where, as here, ATF has extensively and

repeatedly processed these same documents for release to plaintiff. Cf. Allen v. Attorney

General of the State of Maine, 80 F.3d 569, 573 (1st Cir.1996) ("The Law after all, should not

require litigants to engage in empty gestures or to perform obviously futile acts."). The adequacy

of ATF's search is evolving into a matter of issue preclusion.[2]

---

[2] Generally, the doctrine of *res judicata* bars parties from re-litigating issues that have
been addressed in earlier litigation. See Allen v. McCurry, 449 U.S. 90, 94 (1980); Parklane
v. Shore, 439 U.S. 322, 326 n.5 (1979). The doctrine upholds the finality of decisions
It serves the interests in comity between courts in various jurisdictions. Lytle v.
Mfg., Inc., 494 U.S. 545, 553 (1990); Qwest Corp. v. Federal Comm. Comm'n, 252

Plaintiff also objects to ATF's provision of less than the full contents of two audio-taped

telephone conversations, one of which took place on May 13, 1997 and the other on September

27, 1997. Pl.'s Opp. at 14-15. As to the former, ATF previously a full transcript of the call

during the discovery in his criminal case, and plaintiff now complains that he is entitled to a

certified copy of the transcript.[3] The FOIA does not require agencies to create documents, let

alone to certify them. As to the audio elements, ATF released another copy of the audio-tape to

plaintiff on January 26, 2006. See 2d Chisholm Dec. ¶ 15.

The second taped conversation has not been released to plaintiff because one of the

participants to the call was acting as a confidential informant for the government. The identity

and everything the confidential informant said during the conversation is covered by Exemption

7(D). See id. ¶ 16. Recognizing the magnitude of the compelling law enforcement need to

protect sources and prevent critical information from "drying up," courts traditionally afford a

broad construction to Exemption 7(D). Shaw v. FBI, 749 F.2d 58, 61 (D.C. Cir. 1984). The

danger of retaliation against confidential sources, physical and otherwise, is a factor to be

---

F.3d 462, 466 (D.C. Cir. 2001). Accordingly, "once an issue is actually and necessarily
determined by a court of competent jurisdiction, that determination is conclusive in subsequent
suits based on a different cause of action involving a party to the prior litigation." Montana v.
United States, 440 U.S. 147, 153 (1979). In this case, the issue of the adequacy of ATF's search
for the records associated with its investigation of plaintiff was ultimately determined in ATF's
favor in Civil Action No. 99-2712 (JR). Unless reversed on that issue on the pending appeal, No.
05-5142, in the D.C. Circuit, plaintiff will not be able to challenge the adequacy of the search for
records here because the re-processing of the same records for information associated with the
ten Privacy Act waivers could only result in a subset of the documents being released.

[3] The exhibits to plaintiff's amended complaint in Civil Action No. 99-2712 (JR)
demonstrate that plaintiff's criminal defense counsel was provided a copy of the May 13, 1997
tape on November 10, 1997. See Am. Compl. in Civil Action No. 99-2712, at Exhibit B, a copy
of which is attached hereto as Exhibit 2.

- 3 -

See Ortiz v. HHS, 70 F.3d 729, 732 (2d Cir. 1995). Exemption 7(D) protects all information which would tend to reveal the confidential source's identity, including the time and place of events or meetings and information provided by the confidential source which could allow his or her identity to be deduced. Ibarra-Cortez v. Drug Enforcement Admin., 36 Fed. Appx. 598, 598 (9th Cir. 2002); Accuracy in Media v. FBI, No. 97-2107, slip op. at 5 (D.D.C. Mar. 31, 1999) (attached as Exhibit 3). The contents and timing of a telephone conversation pose a genuine risk of exposing the identity of this confidential informant. Id. Accordingly, the Court should approve the withholding of the tape because revealing any additional information beyond the date of the conversation would vitiate the protection afforded by Exemption 7(D).

On the other hand, ATF's techniques and methods of obtaining a recording of this particular conversation is protected by Exemption 7(E). Exemption 7(E) affords "categorical" protection for "techniques and procedures" used in law enforcement investigations or prosecutions. Smith v. Bureau of Alcohol, Tobacco & Firearms, 977 F.Supp. 496, 501 (D.D.C. 1997), citing Fisher v. United States Dep't of Justice, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992). While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness. See, e.g., Coleman v. FBI, 13 F.Supp.2d 75, 83 (D.D.C. 1998) (applying 7(E) to behavioral science analysis and details of polygraph examination); Butler v. Treasury, 1997 WL 188720 at *4 (D.D.C. 1997) (applying 7(E) to types of monitoring and type of equipment used in surveillance); Perrone v. FBI, 908 F.Supp. 24, 28 (D.D.C. 1995) (applying 7(E) to type of polygraph test, type of machine used, polygraph questions and sequence).

- 4 -

Plaintiff notes that defendant has not provided a <u>Vaughn</u> index for File 05-336. Pl.'s Opp. at 16. ATF is providing one herewith. <u>See</u> 2d Chisholm Dec. ¶ 17 & embedded <u>Vaughn</u> index for File 05-336. The information provided contains sufficient information about the documents and the exemptions claimed to permit review by this Court.

With respect to documents which have been re-processed for release to plaintiff based on the Privacy Act waivers he supplied, plaintiff complains about the quality and completeness of the copies he received. Pl.'s Opp. at 22-23. As an initial matter, it should be obvious that only pages on which information relating to the third parties for whom plaintiff supplied Privacy Act waivers contain information responsive to his FOIA request in this case. Thus, it is clear that plaintiff is not entitled to have his entire file re-released. In any event, based on his opposition to defendant's motion for summary judgment, ATF recently supplied plaintiff with better quality copies of the documents it previously released with the names of people who submitted Privacy Act waivers uncovered. <u>See</u> 2d Chisholm Dec. ¶ 10. Plaintiff's request that the remainder of his entire criminal case file (<u>i.e.</u>, those pages on which the names of none of those ten people appear) be re-processed for release in the identical manner as before should be denied because plaintiff has already received those pages through his earlier FOIA request. As such, plaintiff's opposition boils down to his speculation that the ATF made mistakes when it re-processed his files and that more information related to the ten individuals for whom Privacy Act waivers have been supplied may exist. Notably, plaintiff fails to point to a single instance where he has any reason to believe that such a mistake was made. His mere speculation that additional information in the files relates to one or more of those ten people is an insufficient basis on which to deny summary judgment. That he admits that ATF has released information as a result of his

- 5 -

provision of ten Privacy Act waivers is evidence of its good faith. Cf. Safeguard Servs., Inc. v. Securities & Exchange Comm'n, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (agency affidavits are ordinarily accorded a presumption of good faith in FOIA cases which cannot be rebutted by purely speculative claims).

Plaintiff generally challenges ATF's withholdings under Exemptions 3, 7(C), 7(D), and 7(F). See Pl.'s Opp. at 17-22. Similarly, plaintiff's theory that two particular documents have further non-exempt material which may be released is based on nothing more than his own speculation which is insufficient to create a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (at summary judgment, once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial). The record reflects both that ATF carefully reviewed each document and segregated all non-exempt information for release and that the grounds for the exemptions relied upon are sound.[4] Many of the documents attached to plaintiff's opposition brief, which are samples of that processing, confirm that care was taken and the Court should accord the agency's declarations a presumption of good faith because plaintiff fails to demonstrate any reason not to treat them that way.

Although plaintiff largely fails to identify any issue with regard to the ATF's search for information to his FOIA request, he requests appointment of counsel to undertake discovery on the adequacy of the search. That request, which is not the subject of a separate motion, should be

---

[4] Indeed, because the effect of the Privacy Act waivers supplied by plaintiff would lead only to the removal of exemption claims and the exemptions were all previously approved by the Court in Civil Action No. 99-2712 (JR), most of the issues in this regard will become subject to issue preclusion when the decision in Civil Action No. 99-2712 (JR) becomes final. See supra, footnote 2.

for several reasons. First, plaintiff's request is grounded in the notion the misguided notion that ATF has admitted that did not search DF-58822. <u>See</u> Pl.'s Opp. at 24. Indeed, ATF has no difficulty locating file DF-58822, it reasonably declined to process it as being entirely duplicative of the contents of the casefiles because, as explained above, file DF-58822 was created by the Office of the Chief Counsel. Consequently, the "admission" upon which plaintiff requests counsel is non-existent. Second, although appointment of counsel lies in the sound discretion of the Court, plaintiff has not shown that he satisfies the factors generally used to guide that discretion, other than financial need which the Court examined when it granted his petition to file this action *in forma pauperis*. <u>See</u> Local Civil Rule 83.11(b)(3); <u>see also</u> <u>Willis v. Federal Bureau of Investigation,</u> 274 F.3d 531 (D.C. Cir. 2001) (analyzing and comparing the factors for appointment of counsel in a FOIA case with those for appointment of counsel in cases brought under Title VII as set out in <u>Poindexter v. FBI</u>, 737 F.2d 1173 (D.C. Cir. 1984)). Moreover, the absence of any need for discovery in this case is apparent from the fact that ATF did not need to perform a new search for plaintiff's criminal case files when it received the FOIA request which is the subject of this case because it has assembled them in the course of Civil Action No. 99-2712 (JR), where counsel was appointed after ATF discovered additional documents.

Finally, plaintiff's request for the Court to appoint special counsel at the conclusion of the pursuant to 5 U.S.C. § 552(a)(4)(F) to determine whether individual employees arbitrarily or capriciously withheld information is premature and unfounded. The record in this case reflects ATF's detailed response to plaintiff's FOIA request. All reasonably segregable information has released to plaintiff, in some cases more than once. Consequently, there has been no

- 7 -

withholding and there is no basis on which to inquire further into ATF's responses to

plaintiff's FOIA request.

## **Conclusion**

Because ATF has shown that it conducted a reasonable search for information about

responsive to his requests and that it properly applied the FOIA applicable exemptions, and that

ATF has released all reasonably segregable information, the Court should grant its motion.

Dated: February 13, 2006.

Respectfully submitted,

KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney

JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161

- 8 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Willie Boyd,<br><br>    Plaintiff<br><br>        v.<br><br>Bureau of Alcohol, Tobacco,<br>Firearms and Explosives<br><br>    Defendants | )<br>)<br>)<br>)<br>)  Case No. 1:05CV01096 RU<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

SECOND DECLARATION OF PETER J. CHISHOLM,
ACTING CHIEF, DISCLOSURE DIVISION,
BUREAU OF ALCOHOL, TOBACCO FIREARMS AND EXPLOSIVES

I, Peter J. Chisholm, do hereby depose and say:

1.  I am the Acting Chief, Disclosure Division, Bureau
of Alcohol, Tobacco Firearms and Explosives (ATF),
Department of Justice.  In this capacity, I receive all
requests made of ATF under the Freedom of Information Act
(FOIA), 5 U.S.C. § 552, and the Privacy Act (PA), 5 U.S.C.
§ 552a.  In this capacity, I also review all requests
referred to ATF from other agencies that have located ATF-
originated documents in their records while processing
their FOIA and PA requests.  I am responsible for
processing all FOIA and PA requests, initiating searches
relevant to such requests, supervising the determination of
what records should be disclosed, processing all ATF



-2-

documents referred to ATF and other agencies, and recording

all administrative appeals filed with ATF.  Prior to being

assigned as the Acting Chief on an emergency basis on

November 21, 2005, my position was Senior Disclosure

Specialist.

    2.  I am executing this declaration in connection with

ATF's Reply to Plaintiff's Response to Defendant's Motion

for Summary Judgment dated November 21, 2005 (hereinafter

"Plaintiff's Response.")  Specifically, this declaration

will address Plaintiff's contentions with respect to ATF

Disclosure File Nos. 00-311, 00-1470, 00-1670, 02-1078, 04-

1132, 04-1155, 05-336, and 05-352 as they relate to his

request for Confidential Informant policies and procedures,

and the re-release of documents from his ATF criminal

investigative file based on ten Privacy Act Waivers

submitted by Plaintiff after the initial release.

             **Confidential Informant Policies and Procedures**

    3.   Plaintiff made a FOIA request on December 6, 2004

for "the policies and procedures of BATF (sic) on

confidential sources and/or confidential informants,"

hereinafter referred as ATF Disclosure No. 05-352.  By

letter dated January 7, 2005, ATF provided to Plaintiff

segregable portions of the ATF Confidential Informant

Agreement and supporting instruction documents, e.g., a sample memorandum requesting the registration of an informant. Six pages were released, with redactions made pursuant to FOIA exemption (b)(7)(C).

4. Plaintiff subsequently appealed ATF's decision. By letter dated August 1, 2005, the Department of Justice's Office of Information and Privacy (OIP) released to Plaintiff sixteen pages from the ATF Order dealing with confidential informants with redactions made pursuant to FOIA exemptions (b)(2) and (b)(7)(E). OIP otherwise upheld ATF's decision regarding its January 7, 2005 release to Plaintiff. In addition, ATF made a subsequent release, without redaction, of the Attorney General's Guidelines Regarding the Use of Confidential Informants (May 30, 2002) on August 9, 2005.

5. Plaintiff makes several objections regarding these releases. See Plaintiff's Response at 10-12. First, Plaintiff objects to redactions made to the Confidential Informant Agreement. The only redactions were names used in the agreement as a sample informant and sample special agents. The model agreement uses actual names rather than obviously fictitious names such as "John Q. Public." As such, even though the names are intended to have the same effect as "John Q. Public," they were properly redacted

under Exemption (b)(7)(C) because they are actual names of persons which appear in law enforcement records.

6.  Plaintiff also objects to the fact that the release had the word "FOIA" written across the face of each page. See Plaintiff's Response at 10-11. It is longstanding ATF policy to mark these types of releases so that they cannot be used to create bogus ATF Confidential Informant Agreements. Moreover, the marks do not in any way affect the legibility of the document

7.  Plaintiff further maintains that ATF's search for confidential informant policies and procedures is inadequate because he was not provided with all of the pages from ATF Orders 3210.7B and 3250.1A. See Plaintiff's Response at 10-12. Upon further examination, it is apparent that ATF Order 3210.7B has been rendered obsolete by ATF Order 3250.1A. As such, ATF again reviewed ATF Order 3250.1A and made a new release to Plaintiff on January 26, 2006, of the segregable portions of the thirty-eight page Order. A Vaughn Index regarding that release is attached hereto.

## Re-release of Investigative File Based on
## Subsequently Received Privacy Act Waivers

8.  By letter dated December 1, 2004, Plaintiff requested additional information, which had been redacted

from releases previously made to Plaintiff (ATF Disclosure
Numbers 00-311, 00-1670, and 02-1078) from ATF's criminal
investigative file on him.  In connection with this
request, Plaintiff submitted ten waivers in which the named
individuals waived any privacy interests in ATF's criminal
investigative file on Plaintiff.

9.  By letter dated March 22, 2005, ATF forwarded
Plaintiff 12 documents from Disclosure File 00-311, under a
newly allocated file number of Disclosure File 05-336, with
redactions made pursuant to FOIA exemptions (b)(7)(C),
(b)(7)(D), and (b)(7)(E).  Although that letter informed
Plaintiff that ATF had not yet completed its re-review of
Disclosure Files 00-1670 and 02-1078 and that his right of
appeal would not be prejudiced by waiting for ATF to make a
release of Disclosure Files 00-1670 and 02-1078 without
prejudice, Plaintiff appealed to OIP on March 30, 2005
challenging both the exemptions asserted in ATF's March 22,
2005 release as well as the non-release of documents from
the other ATF Disclosure Files.

10.  By letter dated July 12, 2005, OIP informed Mr.
Boyd that his appeal was being closed based on the filing
of the instant action.  In the meantime, ATF continued to
process Disclosure Files 00-1670 and 02-1078 and
consequently released an additional fifty-one (51) pages to

plaintiff by letter dated September 15, 2005, with redactions made pursuant to (b)(5). All of these documents were previously released to plaintiff with the names and identifying information of third parties withheld pursuant to exemption (b)(7)(C). In connection with this current request, plaintiff submitted Privacy Act waivers from these people. As such, these documents were re-released to plaintiff: this time with the previously redacted names and identifying information of the people who executed waivers included. Plaintiff has suggested that the documents that were re-released to him were not the best possible copies available. A better quality copy of the documents have been made, and were released to Plaintiff on January 26, 2006.

11. As noted on page 16 of Plaintiff's Response, ATF did not provide a Vaughn Index with respect to the September 15, 2005 release. Although that was not done because this was an initial release, a Vaughn Index regarding that release is attached hereto.

12. Plaintiff suggests that, because he requested records relating to himself and submitted 10 Privacy Act records, his entire investigative file should be released to him without redaction. See Plaintiff's Response at 13-14. However, as indicated in previous ATF Declarations and

Vaughn Indexes, redactions were made pursuant to Exemptions
(b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F), all of which
were discussed at length in previous ATF Declarations in
this and the previous action.

13. In the interests of brevity, I will just briefly
reiterate why these exemptions continue to apply.
Exemption (b)(7)(C) was used to protect the names of law
enforcement officers and agents, and any third parties who
did not submit Privacy Act waivers, along with their
identifying information. Exemption (b)(7)(D) continues to
be applicable to one audio-taped conversation for which the
Privacy Act waivers submitted by plaintiff are applicable.
Exemption (b)(7)(E) of the FOIA was asserted to protect
from disclosure information regarding various methods of
protecting threatened witnesses. Exemption (b)(7)(F) was
used to protect the names of third parties who did not
submit Privacy Act waivers to protect their physical
safety.

14. Plaintiff also maintains that ATF's search was
inadequate because it did not include documents from "ATF
Case File DF-58822." See Plaintiff's Response at 14. That
file was generated by ATF's Office of Chief Counsel in
connection with Plaintiff's initial FOIA request and first
litigation. I have been informed that this file does not

in any additional responsive documents that have not been previously processed in connection with either Plaintiff's first litigation or this action.

15.   Plaintiff further takes issue with two audio-taped conversations, one from May 13, 1997 and one from September 27, 1997.  <u>See</u> Plaintiff's Response at 14-15. Although ATF has already released to Plaintiff the full transcript of the May 13, 1997 tape conversation, ATF released an audiotape copy to Plaintiff on January 26, 2006.  There were some digital redactions made of some voices from whom Plaintiff did not submit Privacy Act waivers pursuant to Exemption (b)(7)(C).  As such, ATF has now provided Plaintiff with a copy of the audio-tape and a copy of a transcript of that tape.

16.   Regarding the September 27, 1997 tape conversation, the Privacy Act waivers submitted by Plaintiff not do affect ATF' prior decision to withhold the entire conversation under Exemptions (b)(7)(D) and (b)(7)(E).  This audio-tape was made with the consent of one of the parties to the conversation who was a confidential informant with an express promise of confidentiality.  Plaintiff was not a participant in the conversation.  Exemption (b)(7)(E) was asserted to protect from disclosure information regarding evidence collection niques.

17. Regarding Plaintiff's contention that he did not receive a complete <u>Vaughn</u> Index for ATF Disclosure File No. 05-336, <u>see</u> Plaintiff's Response at 16, an additional <u>Vaughn</u> Index is attached hereto.

### ATF's Use of Exemptions (b)(7)(C) and (b)(7)(D)

18. Plaintiff contends that there is a contradiction between ATF's previous <u>Vaughn</u> Index and the Declaration of Averill P. Graham because one states that a total of 69 pages were withheld in their entirety and the other states that three documents were so withheld. <u>See</u> Plaintiff's Response at 17-19. In fact, no contradiction exists. There were three documents withheld in their entirety: document 16 (consisting of 63 pages); document 28 (consisting of two pages); and document 38 (consisting of four pages). In total, the three documents consist of sixty-nine pages. The <u>Vaughn</u> Index and the Declaration merely said the same thing, in slightly different ways.

19. Plaintiff also contends that Exemption (b)(7)(D) should not apply in this case because one ATF Declaration, executed more than six years, states that ATF was relying on an implied assurance of confidentiality in withholding information regarding a confidential informant, and another declaration, executed more than 5 ½ years ago, states that ATF was relying on an express assurance of confidentiality

in withholding information regarding a confidential

informant.  See Plaintiff's Response at 20-22.

20.  ATF properly withheld information pursuant to

Exemption (b)(7)(D) regardless of whether there was an

implied or express promise of confidentiality.  I have been

informed that by the ATF Special Agent assigned to ATF's

investigation of the Plaintiff that ATF had an implied

assurance of confidentiality with a witness whom another

Federal law enforcement agency had registered as a

confidential informant.  As noted, in any event, ATF

believes that the witness is entitled to the protection

afforded by Exemption (b)(7)(D).

### Adequacy of the Search

21.  I have caused yet another comprehensive search of

Plaintiff's investigative file and other documents

responsive to Plaintiff's request and have been advised

that ATF has conducted a search of all locations likely to

contain responsive documents using methods reasonably

expected to uncover all relevant documents.

### Segregability

22.  Plaintiff maintains that ATF's previous Vaughn

indexes do not adequately address the segregability of

ATF's withholding in full of document 28 (a confidential

witness statement) and document 38 (handwritten notes regarding a confidential source). See Plaintiff's Response at 20-23. The Disclosure Division has again reviewed each page of the previous releases made to Plaintiff to ensure that no additional information, other than that discussed above, could be released. There is no additional non-exempt information that could be released to the Plaintiff.

**VAUGHN INDEX OF DELETIONS IN DISCLOSURE TO WILLIE BOYD**
**FROM BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**
*ATF DISCLOSURE FILE # 05-336*

| DOC.# | DOCUMENT DESCRIPTION | EXEMPTION | INFORMATION WITHHELD |
|---|---|---|---|
| 13 | Plaintiff's Arrest Report | (b)(2)<br>(b)(7)(C) | Names and identifying State law enforcement officers; internal law enforcement codes |
| 14 | ATF Memo to FINCEN | (b)(5)<br>(b)(7)(C) | Names of Federal law enforcement officers and third parties, internal discussion about 3rd party investigative information (1 sentence) |
| 15 | Plaintiff's Arrest Report | (b)(2)<br>(b)(7)(C) | Names and identifying info. State law enforcement officers; internal law enforcement codes |
| 16 | Grand Jury Transcript (63 pages) | Federal Rule of Criminal Procedure 6e | All |
| 17 | ATF Phone Message | (b)(7)(C) | Identifying information of third party |
| 18-27 | Transcript of Conversation | (b)(7)(C)<br>(b)(7)(D)<br>(b)(7)(F) | Names and identifying information of Federal and State law enforcement officers and third parties, |
| 28 | Confidential Witness Statement (2 pages) | (b)(7)(C)<br>(b)(7)(D)<br>(b)(7)(F) | All |
| 29-30 | State Search Warrant Affidavit | (b)(7)(C) | Names and identifying information of State law enforcement officers and third parties |
| 31 | ATF Report of Investigation | (b)(7)(C)<br>(b)(7)(D)<br>(b)(7)(E) | Names and identifying information of Federal law enforcement officers and confidential informants, and investigative techniques |
| 32 | ATF Disclosure Sheet | NA | NA |
| 33 | ATF Investigative Notes | (b)(7)(C) | Names and identifying information of State law enforcement officers and third parties |
| 34 | Apartment Application | (b)(7)(C) | Names and identifying Information of State law enforcement officers and third parties |

205-336                                                       Page 2

| DOC.# | DOCUMENT DESCRIPTION | EXEMPTION | INFORMATION WITHHELD |
|---|---|---|---|
| 35-36 | Law Enforcement Database Printouts | (b)(2) (b)(7)(C) | Internal police administrative codes, names of Federal and State law enforcement personnel |
| 37 | ATF Investigative Notes | (b)(7)(C) | Names and identifying information of third parties |
| 38 | Handwritten Notes Relating to Confidential Source (4 pages) | (b)(7)(C) (b)(7)(D) (b)(7)(F) | All |
| 39-42 | ATF Investigative Notes | (b)(7)(C) | Names and identifying information of third parties Federal law enforcement officers |
| 43-46 | Law Enforcement Database Printouts | (b)(2) (b)(7)(C) | Internal police administrative codes, names of State law enforcement personnel |
| 47 | Photograph of Female | NA | NA |
| 48-49 | St. Louis City Records | (b)(2) (b)(5) | Internal administrative codes, intra-agency notes |
| 50-51 | Currency Transaction Records | (b)(2) (b)(7)(C) | Internal administrative codes, names and Identifying information of third parties |
| 52 | Employment History | (b)(2) (b)(7)(C) | Internal administrative codes, names and Identifying information of third parties |
| 53 | ATF Disclosure Sheet | NA | NA |
| 54-62 | Law Enforcement Database Printouts | (b)(2) (b)(7)(C) | Internal police administrative codes, names of Federal and State law enforcement personnel and third parties |
| 63-64 | ATF Report of Investigation | (b)(7)(C) | Names and identifying information of Federal law enforcement officers |
| 65 | St. Louis City Records | (b)(2) | Internal administrative codes |
| 66 | Plaintiff's Arrest Report | (b)(2) (b)(7)(C) | Names and Identifying info. of State law enforcement officers |

**VAUGHN INDEX OF DELETIONS IN DISCLOSURE TO WILLIE BOYD**
**FROM BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**
*ATF DISCLOSURE FILE # 06_____*

| DOC.# | DOCUMENT DESCRIPTION | EXEMPTION | INFORMATION WITHHELD |
|---|---|---|---|
| 8 | ATF Confidential Informant Order | (b)(2) (b)(7)(E) | Administrative information and techniques involving the protection of informants/cooperating witnesses and agent conduct |
| 9 | ATF Confidential Informant Order | (b)(2) (b)(7)(E) | Internal LE Informant Code |
| 10 | ATF Confidential Informant Order | (b)(2) (b)(7)(E) | Internal LE Informant Codes |
| 15 | ATF Confidential Informant Order | (b)(2) (b)(7)(E) | Administrative information and techniques involving the protection of informants/cooperating witnesses and agent conduct |

I declare under penalty of perjury that the foregoing
is true and correct. Executed this 26ᵗʰ day of January
2006.

_____
Peter J. Chisholm
Acting Chief, Disclosure Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Willie Boyd,                          )
                                      )
        Plaintiff                     )
                                      )
            v.                        )    Case No. 1:05CV01096 RU
                                      )
Bureau of Alcohol, Tobacco,           )
Firearms and Explosives               )
                                      )
        Defendants                    )
                                      )
                                      )

THIRD DECLARATION OF PETER J. CHISHOLM,
ACTING CHIEF, DISCLOSURE DIVISION,
BUREAU OF ALCOHOL, TOBACCO FIREARMS AND EXPLOSIVES

I, Peter J. Chisholm, do hereby depose and say:

1.  I am the Acting Chief, Disclosure Division, Bureau
of Alcohol, Tobacco Firearms and Explosives (ATF),
Department of Justice.  In this capacity, I receive all
requests made of ATF under the Freedom of Information Act
(FOIA), 5 U.S.C. § 552, and the Privacy Act (PA), 5 U.S.C.
§ 552a.  In this capacity, I also review all requests
referred to ATF from other agencies that have located ATF-
originated documents in their records while processing
their FOIA and PA requests.  I am responsible for
processing all FOIA and PA requests, initiating searches
relevant to such requests, supervising the determination of
what records should be disclosed, processing all ATF

**Appendix-C**

-2-

documents referred to ATF and other agencies, and recording

all administrative appeals filed with ATF.  Prior to being

assigned as the Acting Chief on an emergency basis on

November 21, 2005, my position was Senior Disclosure

Specialist.

2.    I am executing this declaration in connection with

the Court's Memorandum Opinion dated September 29, 2002,

Granting in Part and Denying in Part the Defendant's Motion

for Summary Judgment (hereinafter "Memorandum Opinion.")

Specifically, this declaration will provide additional

support for ATF's withholdings of information under FOIA

Exemptions 2, 5, 7(D), 7(E), and 7(F).

### Exemption 2

3.    The Memorandum Opinion states that ATF did not

offer a meaningful explanation of how the disclosure of

computer codes from the Treasury Enforcement Communications

System (TECS), a law enforcement database used by ATF to

conduct criminal history checks, may risk circumvention of

law enforcement efforts.  See Memorandum Opinion at 10.

4.    Exemption (b)(2) protects from disclosure material

"related solely to the internal personnel rules and

practices of an agency," including predominantly internal

matters the disclosure of which would risk circumvention of agency regulations or statutes.

5.   Exemption (b)(2) is being invoked for limited and purely internal information contained in the Treasury Enforcement Communications System (TECS), a law enforcement database used by ATF to conduct criminal history checks. The data displayed on screen prints of TECS records is redacted for the following reasons. Information displayed identifies the terminal from which a query was accomplished by a terminal ID and a logical unit ID to show its mainframe connection. The remaining data relates to the software applications that identify how the displayed record was retrieved: specifically, the software program mapping code, the routing codes within the program that allows the query to move from screen to screen, and the codes that allow movement to other programs from the displayed screen.  These sensitive codes are information that, in the hands of computer literate individuals with mainframe knowledge and TECS information already released by ATF pursuant to a FOIA request, could provide information on the structure of the mainframe system used and expose the system to circumvention.  Further, disclosure could facilitate unauthorized access to TECS and

interfere with investigations and law enforcement activities at all levels.

6.    The information withheld from plaintiff also includes internal administrative codes, e.g., laboratory and property tracking numbers or general file numbers. This information is for either administrative and/or law enforcement purposes only and is of no legitimate interest to the public since it reveals nothing about ATF's enforcement activities.    Disclosure of this material could also risk circumvention of the law.    In addition, this information includes computer codes from other Federal law enforcement computer databases (e.g. NCIC, NLETS) and law enforcement computer databases maintained by the State of Missouri which, in the hands of someone with computer knowledge and a predisposition, may be able to improperly access those databases.

**Exemption 5**

7.    The Memorandum Opinion concludes that ATF did not provide enough information for documents 48 & 49, which were labeled as "St. Louis City Records," to determine where the information in question was a direct part of a pre-decisional deliberative process.    See Memorandum Opinion at 13.

8.   Documents 48 and 49 are two St. Louis City
Assessor's Office documents concerning certain pieces of
real property located in St. Louis, Missouri.  ATF
personnel were investigating Plaintiff's connection to
these properties as part of its investigation of
Plaintiff's activities.  The information withheld in
documents 48 and 49 consists of a handwritten note on each
page which indicates the opinion of an ATF special agent
that more detailed information is needed, in the form of
additional Government records, to determine the viability
of a federal criminal violation and/or prosecution.  These
notes reflect the internal deliberation and communication
of agency personnel with each other prior to the decision
to indict or recommend indictment.  This information is of
the same nature as that ATF withheld on Document 14, which
the Court accepted, in the sense that both applications of
Exemption 5 relate to requests for investigative
information.

### Exemptions (b)(7)(D)

9.   The Memorandum Opinion states that ATF failed to
demonstrate whether a confidential source or sources had
been granted confidentiality, or whether the circumstances
of their assistance warranted an reasonable inference of
confidentiality.  See Memorandum Opinion at 16-17.

10. As noted in my prior Declaration, I have been informed that by the ATF Special Agent assigned to ATF's related investigation of the Plaintiff that ATF had an implied assurance of confidentiality with a witness based on the fact that another Federal law enforcement agency had registered him or her as a confidential informant. In addition, an implied assurance was appropriate based on the violent nature of the criminal activities being investigated, firearms and controlled substance violations, as well as the defendant's previous multiple convictions for such offenses.

11. Regarding the deletion of deletion of certain individuals' names, including the name of the name of the informant, ATF did not withhold the names of the participants, as indicated in the Memorandum Order, but rather a certain name or names mentioned by the participants. As noted in the Memorandum Order, ATF has given an express promise of confidentiality to the person or persons mentioned the participants in the conversation in question.

### Exemptions (b)(7)(E)

12. The Memorandum Order held that ATF did not satisfy its burden to withhold portions of an ATF Order

regarding Informant Use and Operations because it did offer
a sufficient description of the material in question.

13.  This ATF Order was issued to all Criminal
Enforcement Personnel and contains policy and instructions
relating to informant use and undercover operations during
the course of ATF criminal investigations.  The ATF Order
primarily outlines the development, use and control of ATF
Informants, the use of ATF Special Agents in an undercover
role, and guidelines on maintaining the security and
control of undercover operations and sting operations. Due
to the sensitive and dynamic nature of investigations
utilizing informants and undercover operations, certain
investigative techniques were withheld under b2 and b7E.
These techniques, if released, could allow the subject of
an ATF investigation intimate knowledge of the restrictions
placed on an undercover Special Agents and/or informants,
ultimately jeopardizing the safety of the individuals, and
compromising the investigation.  ATF also withheld portions
of one document under b7E for similar reasons; in this
instance, specifically detailing information regarding
informant development.

## Exemptions (b)(7)(F)

14. The Memorandum Order held that ATF did not satisfy its burden to withhold information pursuant to Exemption (b)(7)(F). When responding to FOIA requests, ATF generally withholds names and identities of law enforcement personnel and 3rd parties in criminal investigation under b7C. Information is deemed necessary to withhold under b7F if the intention is not just the protection of the privacy of the individual, but to protect the safety of the individual as well. The information withheld under b7F is warranted in this instance, as during the course of the investigation, ATF agents documented concern for individuals' safety, including threats to individuals participating in the investigation. This level of protection is also warranted for the individual or individuals who did not have an express assurance of confidentiality with ATF for which names and identifying information was withheld under b7D.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of December 2006.

_____
Peter J. Chisholm
Acting Chief, Disclosure Division